**MORGAN GUARANTY TRUST COMPANY OF NEW YORK, et al., Plaintiffs,**

v.

**HELLENIC LINES LIMITED, et al., Defendants.**

**No. 83 Civ. 8560 (RWS).**

United States District Court, S.D. New York.

Sept. 6, 1984.

See also, 585 F.Supp. 1227; 38 B.R. 987.

Lord, Day & Lord, New York City, for Morgan Guar. Trust Co. of New York; John J. Loflin, John Grimmer, New York City, of counsel.

Nourse & Bowles, New York City, for International Terminal Operating Co., Inc.; John E. Bradley, Michael E. Crowley, New York City, of counsel.

Walker & Corsa, New York City, for North American Refractories Co., Inc.; Christopher H. Mansuy, Michael T. Spallino, New York City, of counsel.

Hill, Betts & Nash, New York City, for T. Smith & Son, Stevedores, Inc. and Crescent Towing and Salvage Co.; Robert B. Fougner, Kevin P. Farmer, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for Itel Containers Intern. Corp.; Alfred E. Yudes, Jr., Brooklyn, N.Y., of counsel.

## OPINION

SWEET, District Judge.

Plaintiffs Morgan Guaranty Trust Company of New York ("Morgan"), Continental Illinois National Bank & Trust Company of Chicago ("Continental"), National Westminister Bank USA ("Natwest"), Banque de la Societe Financiere Europeenne ("BSFE") and SFE Banking Corporation Limited ("SFE") (collectively "plaintiff Banks") have moved for an order approving as reasonable administrative costs certain expenses incurred in connection with the maintenance and sale of the vessels arrested in these consolidated actions. In addition, International Terminal Operating Co., Inc. ("ITO") has moved for an order permitting certain container storage expenses, unreimbursed gate charges, Trailer Inspection Report charges, container mounting and grounding charges, and advertising charges paid by ITO to be treated as administrative costs. Finally, North American Refractories Co., Inc. ("NARCO") has moved for an order designating the costs incurred by Refractories in connection with the discharge of cargo from the M.V. HELLENIC STAR as administrative costs. For the following reasons, the motions of plaintiff Banks and NARCO are granted in pertinent part. ITO's motion is granted with respect to advertising expenses in the amount of $461.48. The remainder of ITO's motion is granted in part and denied in part.

**Factual and Procedural History**

On November 23, 1983, Morgan, Continental, Natwest and BSFE commenced the 83 Civ. 8560 action against Hellenic Lines Limited ("Hellenic") *in personam* and the M/V HELLENIC INNOVATOR ("INNOVATOR"), the M/V HELLENIC IDEAL ("IDEAL") and the M/V HELLENIC STAR ("STAR"), *in rem*, seeking to foreclose on those vessels under the ship mortgages. Pursuant to Supplemental Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, a warrant of arrest was issued, and the United States Marshal for the Southern District of New York (the "Marshal") arrested the STAR on November 25, 1983, the INNOVATOR on November 28, 1983, and the IDEAL on November 29, 1983. Numerous other parties also arrested the vessels or intervened in the action commenced by plaintiff Banks.

At the time of the arrests, the STAR was discharging cargo at the ITO terminal in Brooklyn, and the IDEAL and INNOVATOR were at anchor in New York. On November 30, 1983, the Marshal informed attorneys for plaintiff Banks that the United States Coast Guard required the remov-

al of the IDEAL and the INNOVATOR from anchorage to a berth within twenty-four hours. On December 1, 1983, plaintiff Banks obtained an order from this court directing the Marshal to permit the IDEAL and INNOVATOR to be shifted to a berth, the IDEAL, INNOVATOR and STAR to be discharged, and the IDEAL and INNOVATOR then shifted to an appropriate anchorage or lay berth. The court further directed that "all expenses attendant to the execution of [the] Order, to include but not be limited to pilotage, towage and wharfage is for the initial account of plaintiff, subject to further order of the court ..." In addition, the court ordered plaintiff Banks to indemnify the Marshal against all expenses, losses or injuries arising out of the order. On December 9, 1983, the court directed the Marshal to permit the STAR to be moved and again required plaintiff Banks to indemnify the Marshal.

On December 2, 1983, CTI-Container Leasing Corporation ("CTI") and Transamerica ICS, Inc. ("ICS") commenced an action in the Eastern District of New York, 83 Civ. 5284, and attached certain Hellenic containers bearing the prefix HLLU at the ITO Terminal. The attachment effectively prohibited ITO from delivering cargo stowed in those containers. In addition, Itel Containers International Corporation arrested its containers pursuant to Rule D of the Supplemental Rules for Certain Admiralty and Maritime Claims. At the same time, Hellenic announced to the shipping community that it was suspending all service from New York. Hundreds of Hellenic customers demanded the return or delivery of their respective cargoes.

To permit loaded containers to be moved from the terminal, Hellenic, ITO, CTI and ICS entered into a stipulation and order (the "original stipulation"), signed by the Honorable Jack B. Weinstein on December 7, 1983. Under the terms of the original stipulation, ITO was permitted to release the attached containers if the shipper or consignee provided a security deposit to Hellenic. Hellenic was required to refund the security deposit "upon the safe return of the container[s] to the Terminal, or to

any other storage area designated by the Court, within four weeks of the date of release by the Terminal in the same order and condition as when received from ITO." ITO was required to prepare an equipment interchange report with respect to the condition of each container released from the terminal both at the time of release and the time of return.

On December 7, 1983, at a hearing before this court, the Marshal expressed concern about the scope of the vessel arrests and, in particular, whether containers on board the INNOVATOR, STAR and IDEAL were "appurtenances" of the vessels and therefore subject to the arrests, a position adopted by T. Smith at the hearing. The court orally adopted the original stipulation in open court, extending it to include HLLU containers and all other containers delivered to the terminal for loading on Hellenic vessels or discharged from Hellenic vessels onto the terminal.

As a result of the security deposit requirement, the ITO terminal became overburdened with empty containers. The discharge of the INNOVATOR on or about December 9, 1983 dumped hundreds of additional containers onto the terminal. The stripping (or unloading) of house-to-house containers for Hellenic customers who were unwilling or unable to post the requisite security added dozens more.

On December 10, the M/V HELLENIC SPIRIT ("SPIRIT"), laden with cargo, arrived in New York and was promptly arrested. On December 12, 1983, plaintiffs Morgan and SFE filed a complaint against Hellenic, Transpacific Carriers Corporation ("Transpacific") et al., in personam, and against the SPIRIT, in rem, seeking foreclosure of the first preferred mortgage held by Morgan and SFE on the SPIRIT because of Transpacific's failure to pay certain of Hellenic's obligations which it had unconditionally guaranteed. Morgan and SFE arrested the SPIRIT on December 12, 1983. The congestion at the ITO terminal, however, prevented the immediate discharge of the SPIRIT, and no other termi-

nal or storage facility was willing or able to discharge the SPIRIT or to store the empty containers without payment in advance.

The plaintiff Banks made payments for essential lubricating oil, water and provisions for the SPIRIT. On December 23, 1983, plaintiff Banks obtained an order permitting the shifting and discharge of the SPIRIT and explicitly deeming the plaintiff Banks' reasonable expenses to be administrative costs to be deducted as a first lien out of the proceeds of sale of the vessel.

On January 9, 1984, the court signed an order designed to ease the congestion at the ITO terminal. Under the terms of the order, as subsequently modified, all lessors and owners of empty Hellenic containers were directed to pick up all containers in which they claimed an interest no later than Thursday, January 19, 1984. Any containers left on the terminal after January 20, 1984 would be assessed demurrage at rates prescribed in the order. ITO was required to publish notice of the order in the "Journal of Commerce" on Wednesday, January 11, 1984 and Thursday, January 12, 1984, "such advertising costs being chargeable by ITO as an administrative expense against the sale proceeds of the SPIRIT."

All *in rem* actions against the INNOVATOR, IDEAL, STAR and/or SPIRIT were consolidated on January 24, 1984.[1] Pursuant to the order of this court dated February 3, 1984, the STAR, IDEAL, SPIRIT and INNOVATOR were sold free and clear of all liens and encumbrances. These sales were confirmed by orders dated March 7, 9, 16 and 19, 1984, respectively.

**The plaintiff Banks' application**

The plaintiff Banks seek an order: (1) approving as reasonable all expenses incurred by plaintiff Banks which have previously been deemed administrative costs of this proceeding, (2) deeming certain other expenses incurred by plaintiff Banks as reasonable administrative costs, (3) direct-

ing the clerk of the court to reimburse plaintiff Banks for their approved administrative costs, together with interest, with respect to the IDEAL out of the proceeds of sale of the IDEAL, and (4) deeming the stipulations filed by the plaintiff Banks with respect to the STAR, SPIRIT and INNOVATOR to be reduced by the amount of approved administrative costs, together with interest, with respect to the respective vessels, including the previously approved fees, expenses, and poundage of the U.S. Marshal.

### 1. M/V HELLENIC STAR

With respect to the STAR, plaintiff Banks seek approval of the following expenses:

| | |
|---|---:|
| a) Marshal's fees, expenses and poundage | $ 76,819.95 |
| b) Shipbroker's fees | 10,000.00 |
| c) Shipbroker's expenses | 15,663.20 |
| d) Fee of agents retained by plaintiff Banks to insure that all necessary care and maintenance was undertaken | 17,000.00 |
| e) Expenses of Agents | 264,627.79 |

   (i) Repatriation of crew

      (aa) Wages—$77,570.83

      (bb) Repatriation and related costs—$19,504.56

      (cc) Miscellaneous supplies for crew—$2,432.84

   (ii) Shipkeepers—$1,500.00

   (iii) Towage & pilotage—$2,308.64

   (iv) Wharfage—$18,720.00

   (v) Winterization and Layup—$142,171.63

   (vi) Miscellaneous—$419.29

| | |
|---|---:|
| f) Expenses of discharge | 157,000.00 |
| g) Insurance premium during arrest | 25,891.32 |
| h) Post arrest advertising | 1,536.75 |
| i) N.A.T. (Crew pension fund) | 35,000.00 |
| TOTAL: | $603,539.01 |

---

1. The consolidated actions include:
   83 Civ. 8560
   83 Civ. 8586
   83 Civ. 8608
   83 Civ. 8760
   83 Civ. 8761
   83 Civ. 8966
   83 Civ. 8986
   83 Civ. 8969
   83 Civ. 8974

## 2. M/V HELLENIC IDEAL

With respect to the IDEAL, plaintiff Banks seek administrative cost treatment of the following expenses:

a) Shipbroker's fees — $ 7,500.00

  (i) N.A.T. (crew pension fund) $35,000

b) Shipbroker's expenses — 15,884.18

c) Fee of agents retained by plaintiff Banks to insure that all necessary care and maintenance was undertaken — 17,000.00

d) Expenses of agents — 302,096.55

  (i) Repatriation of crew

    (aa) Wages—$76,751.71

    (bb) Repatriation and related costs—$21,110.17

    (cc) Miscellaneous crew expenses—$2,674.52

  (ii) Shipkeepers—$1,500.00

  (iii) Towage & Pilotage—$4,913.43

  (iv) Wharfage—$19,320.00

  (v) Winterization & Lay-up—$175,177.35

  (vi) Miscellaneous—$649.37

e) Towage & pilotage (separately paid by plaintiff Banks) — 959.30

f) Expenses of discharge — 256,000.00

  (i) bagged nickel matte—$124,000

  (ii) remaining cargo—$132,000.00

g) Insurance premiums during arrest — 22,048.61

h) Post arrest advertising — 1,536.75

i) N.A.T. (crew pension fund) — 26,000.00

    TOTAL: — $649,025.39

## 3. M/V HELLENIC SPIRIT

With respect to the SPIRIT, plaintiff Banks seek administrative cost treatment of the following expenses:

a) Marshal's fees, expenses and poundage — $ 95,364.39

b) Shipbroker's fees — 15,000.00

c) Shipbroker's expenses — 15,707.05

d) Fee of agents retained by plaintiff Banks to insure that all necessary care and maintenance was undertaken — 17,000.00

e) Expenses of Agents — $366,417.61

  (i) Repatriation of crew

    (aa) Wages—$53,837.62

    (bb) Repatriation and costs—$31,162.19

  (ii) Shipkeepers—$1,500.00

  (iii) Towage & Pilotage—$5,247.75

  (iv) Wharfage—$15,530.00

  (v) Winterization and Lay-up—$189,688.84

  (vi) Supplies and miscellaneous—$69,452.05

f) Expenses of discharge — 400,000.00

g) Insurance premiums for arrest period — 37,908.10

h) Post arrest advertising — 4,069.98

i) N.A.T. (crew pension fund) — 28,000.00

    TOTAL: — $979,467.13

## 4. M/V HELLENIC INNOVATOR

With respect to the INNOVATOR, plaintiff Banks seek administrative cost treatment of the following expenses:

a) Marshal's fees, expenses and poundage — $199,773.71

b) Shipbroker's fees — 22,500.00

c) Shipbroker's expenses — 16,040.04

d) Fee of agents retained by plaintiff banks to insure that all necessary care and maintenance was undertaken — 17,000.00

e) Expenses of Agents — 319,434.09

  (i) Repatriation of crew

    (aa) Wages—$68,883.45

    (bb) Repatriation and related costs—$19,027.61

    (cc) Miscellaneous—$2,990.88

  (ii) Shipkeepers—$1,500.00

  (iii) Towage—$2,519.08

  (iv) Wharfage—$30,900.00

  (v) Winterization and Lay-up—$203,613.07

f) Towage and pilotage — 2,303.34

g) Expenses of discharge — 328,000.00

h) Insurance premiums during arrest — 56,792.54

i) Post arrest advertising ($4,610.25/3) — 1,536.75

j) N.A.T. (crew pension fund) — 20,000.00

    TOTAL: — $983,380.47

■ T. Smith & Son, Stevedores, Inc. ("T. Smith"), and Crescent Towing & Salvage Co. ("Crescent") have opposed plaintiff Banks' application to the extent it seeks administrative cost treatment of expenses incurred for discharging, insurance premiums, winterization and lay-up of the vessels, as well as prejudgment interest on all claims for administrative expenses, on the ground that these expenses were incurred solely for the benefit of plaintiff Banks, Morgan in particular, and not for the benefit of the preferred maritime creditors. T. Smith and Crescent also assert that plaintiff Banks unnecessarily incurred many of the discharging expenses as a result of the manner in which they arrested the vessels.

The general rule is that a person who furnishes goods or services to a vessel in *custodia legis* does not acquire a maritime lien against the vessel for the value of such goods or services, *see* Gilmore & Black, Law of Admiralty, 602–03 (2d ed. 1975); 2 *Benedict on Admiralty* § 46, at 3–65 (7th ed. 1983), but an exception to the rule provides that "expenses which have contributed either to the preservation or creation of the fund in [the court's] custody be satisfied before a general distribution among those entitled to receive it." 2 *Benedict on Admiralty, supra,* at 3–36. *New York Dock Co. v. S.S. Poznan,* 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927); *Larsen v. New York Dock Co.,* 166 F.2d 687 (2d Cir. 1948) (wharfage services); *P.T. Perusahaan Pelayaran Samudera Trikora Lloyd v. T.S. Salzachtal,* 373 F.Supp. 267 (E.D.N.Y.1974) (repairs, luboil, pilotage, stores, USDA inspections, medical treatment).

■ Services or property advanced to preserve and maintain the arrested vessels, furnished upon authority of the court, are allowable as *custodia legis* expenses. *New York Dock Co. v. The Poznan,* 274 U.S. 117, 121, 47 S.Ct. 482, 484, 71 L.Ed. 955 (1927); *Turner & Blanchard, Inc. v. The S.S. Emilia,* 322 F.2d 249 (2d Cir.), *cert. denied,* 375 U.S. 880, 84 S.Ct. 150, 11 L.Ed.2d 111 (1963); *General Electric Cred-* *it & Leasing Corp. v. Drill Ship Mission Exploration,* 668 F.2d 811, 816 (5th Cir. 1982); *Payne v. S.S. Tropic Breeze,* 423 F.2d 236, 239–40 (1st Cir.), *cert. denied,* 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970); *Moore v. United States,* 302 F.2d 918 (D.C.Cir.1962); *Bender Welding & Machine Co. v. M/V Sovereign Opal,* 415 F.Supp. 772 (S.D.Ala.1976). The "expenses and fees allowed and costs taxed, by the court," arising out of the foreclosure proceedings, are given priority to the preferred mortgage lien. 46 U.S.C. § 953(b). Included in this priority are expenses of maintaining and preserving the arrested vessels. *See General Electric Credit & Leasing Corp., supra,* 668 F.2d at 815. Even in the absence of a court order authorizing such expenses prior to payment, the court may order "*custodia legis* expenses" to be paid in priority to the mortgage creditor if "equity and good conscience" so require. *Id.* (quoting *New York Dock Co. v. S.S. Poznan, supra* ).

■ The costs of discharging, winterization and lay-up of the IDEAL, STAR, SPIRIT and INNOVATOR while in *custodia legis* were necessary to minimize the possibility of additional claims against the vessels and to maximize the possibility of a sale at a good price. Accordingly, those costs are properly recoverable as administrative costs. *See Turner & Blanchard, supra,* 322 F.2d at 250. Moreover, the parties consented to treatment as administrative expenses of the SPIRIT's discharge costs.

■ The question of insurance premiums, hull and machinery, war risk, and protection and indemnity for the vessels, including past due amounts which were required as a precondition to continued coverage, presents greater difficulty. However, these too are properly treated as administrative expenses because the court and the Marshal required plaintiff Banks to indemnify the Marshal and the United States and to undertake, at their sole initial expense, to preserve the vessels. *See* orders dated December 1, 1983, December 9, 1983 and December 23, 1983. While the

insurance policies protected plaintiff Banks, they also protected Hellenic, the named assured, and the plaintiff Banks had no right to retain any insurance proceeds beyond the amount of the mortgage default. Moreover, because plaintiff Banks indemnified the Marshal, the value of the insurance would have been available to protect the Marshal as bailee for all intervenors. *See Tebbs v. Baker-Whiteley Towing Co.*, 271 F.Supp. 529 (D.Md.1967), *aff'd*, 407 F.2d 1055 (4th Cir.1969).

With respect to prejudgment interest, the general rule is that, although an admiralty court has discretion to grant or deny prejudgment interest, such interest should be awarded absent peculiar circumstances. *General Electric, supra,* 668 F.2d at 816–17; *International Paint Co. v. M/V Mission Viking*, 637 F.2d 382, 386 (5th Cir.1981). Although in many ways peculiar, the circumstances of this case do not warrant a departure from the general rule.

Accordingly, plaintiff Banks' motion is granted, and the following amounts, together with prejudgment interest, are approved as administrative expenses:

| Vessel | Total |
| --- | --- |
| STAR | $603,539.01 |
| IDEAL | 649,025.39 |
| SPIRIT | 979,467.13 |
| INNOVATOR | 983,380.47 |

With respect to the STAR, SPIRIT and INNOVATOR, the amount approved is deemed deducted from the stipulation filed by plaintiff Banks in connection with the purchase of each vessel. With respect to the IDEAL, the amount approved is to be paid by the clerk of the court to plaintiff Banks out of the proceeds of the sale of the vessel.

### ITO'S application

ITO has moved for an order permitting the following costs to be taxed as administrative costs against the sale proceeds of the SPIRIT, INNOVATOR, STAR and IDEAL:

[a] Container storage expenses for the period December 5, 1983 to January 20, 1984 in the amount of $322,245.00, to be taxed as administrative costs against the sale proceeds of the vessels on a *pro rata* basis;

[b] Unreimbursed gate charges, Trailer Inspection Report charges for the period December 7, 1983 to January 20, 1984 in the amount of $29,789.25, to be taxed as administrative costs against the sale proceeds of the vessels on a *pro rata* basis; and

[c] Advertising charges paid by ITO in the amount of $461.48, to be taxed as administrative costs against the sale proceeds of the SPIRIT.

ITO incurred advertising charges in the amount of $461.48 in connection with the publication of a general notice in the Journal of Commerce on January 11 and 12, 1984 in accordance with this court's order dated January 9, 1984. The order was designed to expedite removal of containers from the ITO terminal and to permit discharge of the SPIRIT. Under the terms of the order, the advertising costs incurred by ITO were to be charged as an administrative expense against the sale proceeds of the SPIRIT. Accordingly, ITO's motion is granted with respect to this item, and $461.48 will be treated as an administrative expense to be taxed against the sale proceeds of the SPIRIT.

ITO also seeks administrative cost treatment of container storage expenses and unreimbursed gate charges and other expenses incurred as a result of the so-called "container problem" which plagued the ITO terminal shortly after the arrest of the vessels in this action. During the period December 5, 1983 to January 20, 1984, there was a daily average of 1,371 empty Hellenic T.E.U.'s, or twenty foot equivalent units, at the terminal. The total storage days for empty containers expressed as T.E.U.'s during the period was 64,449. Based on the rate of $5.00 per day per T.E.U. contained in the Port of New York Marine Terminal Tariff No. 2, Section VII, ITO seeks to have $322,245 for container storage taxed as an administrative expense

*pro rata* against the four vessels. The total unreimbursed gate, Trailer Inspection Report, mounting and grounding charges for 765 empty Hellenic units that passed through the terminal gate between December 7 and January 20 is $49,816.80. Of this amount, ITO has been paid $20,018.55 by various container lessors, leaving an unreimbursed balance of $29,798.25.

ITO contends that its storage and processing of empty Hellenic containers was instrumental in preserving the sale proceeds of the vessels to the extent it prevented additional claims by container lessors, shippers and consignees, but plaintiff Banks, T. Smith and Crescent argue that the services performed by ITO inured only to the benefit of Hellenic and the cargo and container interests. While ITO's services in discharging the vessels benefitted all arresting parties, and indeed those services were paid in full by plaintiff Banks prior to their performance by ITO, those opposing ITO's application contend that its marshalling and processing containers in and out of the terminal did not enhance or preserve the fund to be realized upon the sale of the vessels. Plaintiff Banks also argue that the container problem arose independently of the *in rem* proceedings against the vessels and was caused by the attachment and arrest of containers and the assertion of certain intervenors in this proceeding that the containers were appurtenances of the vessels.

In *New York Dock Co. v. S.S. Poznan, supra,* the petitioner furnished wharfage services to the defendant vessel while it was in *custodia legis.* Although several parties sought a court order removing the vessel to another pier, their motion was denied and the vessel remained at the petitioner's wharf for over three months. The petitioner later commenced an *in rem* action against the vessel for the unpaid wharfage charges which was opposed by the cargo claimants who caused the arrest of the vessel. The Supreme Court noted the general rule that a person who furnishes goods or services to a vessel in *custodia legis* does not acquire a maritime lien against the vessel for the value of such goods or services, but the Court allowed the petitioner's custodial claim to take priority over the pre-custodial *in rem* claims, concluding:

> The libellants in the consolidated cause were not only concerned as owners in securing delivery of the cargo, but as lienors they were interested in the ship and, as eventually appeared, in the whole of her proceeds. Service rendered to the ship after arrest, in aid of the discharge of cargo, and afterward pending the sale, necessarily inured to their benefit, for it contributed to the creation of the fund now available to them. The most elementary notion of justice would seem to require that services or property furnished upon the authority of the court or its officer, acting within his authority, for the common benefit of those interested in a fund administered by the court, should be paid from the fund as an "expense of justice."

274 U.S. at 120–21, 47 S.Ct. at 484. The court observed that "[s]uch preferential payments are mere incidents to the judicial administration of a fund." *Id.* at 121, 47 S.Ct. at 484. *See also Larsen v. New York Dock Co., supra,* 166 F.2d at 689 (wharfage services "conferred a benefit upon those interested in the ship.")

The container problem threatened the discharge of the SPIRIT and further threatened the sale proceeds of all four arrested vessels with additional claims by cargo and container leasing interests. Although a number of factors contributed to the container problem, resolution of the container problem was recognized by the court and the parties to be in the interests of all concerned, as evidenced by the January 9, 1984 order of this court. Indeed, that order permitted ITO the right to apply to have these expenses treated as administrative costs. Under the court's direction, ITO endeavored to solve the problem and expected to be reasonably compensated for its services. To the extent ITO's services permitted the timely discharge of the SPIRIT and prevented additional *in rem* claims of relatively high priority, those ser-

vices were instrumental in preserving the sale proceeds of the four vessels, and the SPIRIT in particular. Therefore, the court finds that ITO's services inured to the benefit of most if not all claimants, not just the container interests, and, equity and good conscience require treatment of such costs as administrative expenses.

Plaintiff Banks, T. Smith and Crescent, however, also object to ITO's application because the charges claimed by ITO are neither actual costs of services nor out of pocket expenses. The Port of New York Marine Terminal Tariff No. 2, Section VII, provides for a storage rate on empty containers of $5.00 per day per T.E.U. when there has been a cessation or discontinuation of transportation service. In the normal course of business, ITO charges demurrage to its customers for temporary storage of empty containers at rates ranging from $2.00/unit per day to $2.50/T.E.U. per day. These rates are contained in negotiated rate agreements and would not apply in the event of a discontinuation of transportation service. However, the court finds, on the basis of the record here, that these rates reflect more accurately the actual cost to ITO of container storage. While the court recognizes that these negotiated rates may reflect a discount to ITO's regular customers as an inducement to provide loaded containers, it concludes that, under these unusual circumstances, a reasonable rate for storage of empty Hellenic containers between December 5, 1983 and January 20, 1984 is $2.50/T.E.U. per day.

For the foregoing reasons, ITO's motion is granted to the extent that $161,122.50 for container storage and $29,798.25 for unreimbursed gate and other charges will be taxed as an administrative cost against the sale proceeds of the vessels on a *pro rata* basis. In addition, $461.48 will be taxes as an administrative expense against the sale proceeds of the SPIRIT.

**NARCO's application**

NARCO has moved for an order amending the interlocutory order of sale of the STAR and treating as an administrative expense the difference between the cost incurred by NARCO in discharging three shipments of ore in Brooklyn rather than in Baltimore, Maryland, the port of destination under the contract of affreightment. NARCO had contracted with Hellenic for the carriage of the ore from two ports in South Africa to Baltimore "Free In Out," which means that the cargo interest NARCO, rather than Hellenic, was obligated to pay the loading and discharge expenses. After the arrest of the STAR in New York, NARCO discharged the ore in Brooklyn and trucked it to its ultimate destination. It seeks to have the difference between the actual cost of discharge and the cost of discharge in Baltimore deemed an administrative expense.

NARCO spent $27.16 per long ton for routine discharge in Brooklyn of 5,784.49 long tons. In Baltimore, routine discharge would have cost $4.38 per long ton. The difference is $131,770.68. In addition, 2,391.51 long tons were discharged to a storage pad in Newark at a cost of $9,566.00. Temporary storage in Baltimore would have cost $5,261.32, a difference of $4,304.68. Finally, NARCO spent an additional $2.51 per long ton to truck the ore from Newark to its ultimate destination, resulting in a total difference of $150,594.42 between the cost of discharge in Brooklyn and Baltimore.

T. Smith and Crescent oppose treatment of NARCO's discharge costs as an administrative expense because they claim that NARCO was contractually obligated to pay for the discharge of the ore wherever located and that NARCO discharged the ore solely for its own benefit. As discussed above, however, discharge of the cargo of each of the arrested vessels was for the common benefit of all parties interested in the vessels. Discharge of cargo minimized the possibility of additional claims against the vessels and made the vessels more attractive to prospective buyers. Had NARCO not assumed responsibility for discharge of its cargo, plaintiff Banks would have undertaken to pay the expenses of discharging the ore as well as the other cargo in accordance with the order of this

**1014**

court dated December 1, 1983. Accordingly, the amount expended by NARCO in excess of the routine discharge cost in Baltimore, $131,770.68, and the amount spent for storage in Newark, $9,556.00, will be treated as administrative costs. The difference in the cost of trucking the ore from Newark rather than Baltimore to its ultimate destination is not an administrative cost because it was incurred solely for the benefit of NARCO.

**Conclusion**

The following expenses incurred by plaintiff Banks in connection with the maintenance and sale of the STAR, SPIRIT and INNOVATOR, together with interest, are approved as reasonable administrative expenses:

| | |
|---|---|
| STAR | $603,539.01 |
| SPIRIT | 979,467.13 |
| INNOVATOR | 983,380.47 |

With respect to each vessel, the amount approved is deemed deducted from the stipulation filed by plaintiff Banks in connection with the purchase of the vessel. In addition, $649,025.39, incurred by plaintiff Banks in connection with the maintenance and sale of the IDEAL is approved as a reasonable administrative cost, and the clerk of the court is directed to pay plaintiff Banks $649,025.39, together with interest, out of the proceeds of the sale of the IDEAL.

The clerk of the court is also directed to pay NARCO $141,336.68 plus interest out of the sale proceeds of the STAR and to pay ITO $461.48 plus interest out of the proceeds of the sale of the SPIRIT and $190,920.75 plus interest out of the sale proceeds of the four vessels on a *pro rata* basis.

**IT IS SO ORDERED.**