UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-30166
_____

CROSS EQUIPMENT LTD., WATERMAN SUPPLY CO., INC.,

Plaintiffs-Counter Defendants-
Appellees-Cross-Appellants,

versus

HYUNDAI MERCHANT MARINE (AMERICA) INC.,
HYUNDAI MERCHANT MARINE CO., LTD.,
HYUNDAI AMERICA SHIPPING AGENCY,
TRANSOCEAN TERMINAL OPERATORS INC., In personam,

Defendants-Counter Plaintiffs-
Appellants-Cross Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
(97-CV-2569-E)
_____

May 1, 2000

Before BARKSDALE, BENAVIDES, and STEWART, Circuit Judges.

PER CURIAM:[*]

For this admiralty matter, primarily at issue is whether, and to what extent, a shipper is liable to a marine terminal operator for demurrage when: the shipper's cargo has been offloaded from the vessel to the operator's wharf; the shipper and the carrier dispute, under the bill of lading, responsibility for repairs to the cargo for offloading by the carrier; as a result, the operator and carrier refuse to release the cargo to the shipper; the shipper arrests its cargo; and the carrier and operator assert possessory

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

maritime liens against the cargo, continue to refuse to release it, eventually seize it, and it remains on the wharf, subject to ever increasing demurrage, until bonded out by the shipper. Also at issue is whether the costs related to the repairs to the cargo should be borne by the shipper (necessary to safely offload the cargo) or by the carrier (offload to be at *no* cost to shipper). We **AFFIRM**.

I.

For its cargo in Thailand, valued in excess of $300,000, Cross Equipment, Ltd. and Waterman Supply Co., Inc. (Cross), as shipper, contracted with Hyundai, as carrier, to transport the cargo to New Orleans, "free in-liner out" (Cross paid loading costs; Hyundai, unloading costs). Included in the cargo were 12 used winches; each weighed in excess of 100 tons. The cargo was loaded aboard Hyundai's vessel, the M/V CEMRE II. On its bill of lading, Hyundai did *not* note any cargo deficiencies. When the vessel arrived in New Orleans on 6 August 1997, Cross paid Hyundai approximately $150,000 in freight charges.

The arrival was several days past that scheduled. The vessel docked at a Port of New Orleans wharf leased by Transocean Terminal Operators (TTO). Hyundai hired TTO to perform stevedoring.

Originally, Hyundai had contracted for a floating heavy-lift crane to offload the cargo to a barge. But, because of the vessel's late arrival, that crane was *not* available. As a result, Hyundai and TTO devised an alternative offloading method using TTO's smaller dock-side cranes.

As noted, each of the 12 winches in the cargo weighed in excess of 100 tons. Several were offloaded successfully. But, when offloading another, one of its vertical lifting pad eyes broke. The winch fell several inches to the ship's deck. There was *no* damage.

Marine surveyors, hired by Hyundai, inspected the winches and noted the original pad eyes were one and one-half inches thick; their replacements, one-half inch. Additionally, some pad eyes were elongated, and others distorted. The surveyors determined that, for safe offloading, the lifting pad eyes required repair.

A welding company, hired by Hyundai, repaired/replaced the pad eyes at a cost of $8,000. While the repairs were being made, the vessel was delayed in offloading, at a cost to Hyundai of $7,700. It also incurred approximately $2,300 in standby labor charges.

Offloading was completed on 9 August 1997, three days after the vessel's arrival. Therefore, the 30 days of allowed free time on TTO's wharf began on 10 August. (*No* wharf demurrage accumulates during free time.)

Cross sought possession of its cargo. TTO would *not* release it without authorization from Hyundai. And, Hyundai refused release until Cross paid the repair cost.

Upon expiration of the wharf free time in September 1997, demurrage began accruing. According to TTO's tariff, demurrage, charged per ton per day, was $0.20 for the first seven days; $0.60 for the next seven; and $1.50 for each day thereafter. Demurrage

finally reached approximately $216,000, far in excess of the $8,000 repair cost. (Again, each winch weighed in excess of 100 tons.)

Meanwhile, in federal district court on 15 August 1997, Cross had filed an *in personam* action against Hyundai and TTO for breach of maritime contract, and also sought possession of its cargo from each of them. Pursuant to FED. R. CIV. P. Supplemental Rules For Certain Admiralty and Maritime Claims D, and in order to gain *in rem* jurisdiction, Cross had the cargo arrested. Cross appointed TTO alternate custodian.

On 5 September, Hyundai and TTO answered, as well as counterclaiming for the costs related to the repairs. In addition, they asserted a possessory maritime cargo lien.

The counterclaim was amended on 9 October to add TTO's demurrage claim and seek the cargo's arrest. A week later, Hyundai and TTO received an order for that purpose. (As discussed *infra*, the warrant was *not* served until 5 December, when Cross released its 15 August warrant.)

On cross-motions for summary judgment by Cross and Hyundai, the district court, on 14 November, held Cross liable to Hyundai for the repair cost. It deferred ruling on the other costs related to the repairs, *and ordered the cargo released, except for that necessary to secure Hyundai's lien*.

The record does *not* reflect whether Cross then sought release of a portion of the cargo and/or whether Hyundai, TTO, or both refused, such as by claiming the entire cargo was required to secure their claims. Cross moved to set bond; but that motion was

later denied as moot because, before the court ruled on it, Cross posted bond for the amount claimed by TTO and Hyundai.

On 5 December, Cross released the cargo from arrest. As noted, Hyundai and TTO then had the cargo arrested. Five days later, Cross posted bond. It obtained possession of its cargo on 15 December.

In March 1998, the district court granted partial summary judgment to TTO, holding Cross liable for demurrage. The court deferred the amount due to the bench trial. (TTO sought approximately $216,000, based on the charges discussed *supra*.)

At trial in October 1998, the district court found that "both sides of the dispute adopted an intractable position". It held Cross liable for the other costs related to the repairs. (Earlier, as discussed, Cross had been held liable for the repair cost.) And, it held TTO and Hyundai, as well as Cross, had failed to mitigate damages. In this regard, it ruled that TTO and Hyundai should have detained *only two* of the 12 winches.

Therefore, based in part on equitable principles, judgment for approximately $36,000 was entered against Cross for the demurrage, two-twelfths of the amount sought. This was in addition to costs related to the repairs, together with interest and reasonable attorney's fees (fees were awarded in March 1999), as provided for by the bill of lading.

## II.

Cross contests liability for the costs related to the repairs. It maintains that, instead, it should have been awarded its costs

related to breach of the bill of lading and being refused delivery of its cargo.

Cross also contests liability for demurrage. On the other hand, TTO maintains it should have been awarded the $216,000 demanded.

No authority need be cited for our standards of review. The summary judgments are reviewed *de novo*. For the bench trial, conclusions of law are reviewed *de novo* and findings of fact for clear error.

A.

1.

Cross contends that Hyundai, by claiming Cross is responsible for the repair costs under the bill of lading, is attempting to avoid its obligation incurred in the bill of lading to discharge the cargo without cost to Cross. Clause 19(G) of the bill of lading states:

> If in the *Carrier's opinion*, the goods are in need of sorting, inspecting, mending, *repairing*, or reconditioning, ... the Carrier at its discretion may, by itself or through Subcontractors, and *as agent for the Merchant*, carry out such work at the risk and *expense of the Merchant*.

(Emphasis added.)

a.

Cross maintains: the repairs were done simply to make offloading easier for Hyundai; and, had arrival been timely, the originally intended crane could have offloaded the cargo without repairs being required. Cross maintains also there were alternate

- 6 -

ways to offload without incurring these costs. The district court, relying on the surveyor's affidavits, found the winches unsafe to offload without repair. This finding is *not* clearly erroneous.

b.

Cross contends that clause 19(G) violates the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 *et seq.* It relies on § 1303(8), which prohibits the carrier from limiting its duty to the shipper, except as specifically allowed by statute. In pertinent part, § 1303(8) provides:

> Any clause ... in a contract of carriage relieving the carrier or the ship from liability for loss or damage to ... goods, arising from negligence, fault, or failure in the duties and obligations provided in this section ... shall be null and void.

Analysis of a COGSA damage-to-cargo claim begins with determining whether the shipper has established a *prima facie* case of cargo damage. *E.g., **Quaker Oats Co. v. M/V Torvanger***, 734 F.2d 238, 240 (5th Cir. 1984). The bill of lading is *prima facie* evidence the carrier received the cargo in good condition. 46 U.S.C. § 1303(4). As noted, the cargo was accepted on the bill of lading *without* notation of defects.

Once the shipper has established a *prima facie* case, the carrier can rebut it by establishing one of the exceptions listed in 46 U.S.C. § 1304 (2)(a)-(p) or the catchall provision of 46 U.S.C. § 1304(2)(q). Hyundai relied on subsections (i), (n), and (q), which state:

> (2) neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from

....

> (i) Act or omission of the shipper or owner of the goods
>
> ....
>
> (n) Insufficiency of packing;
>
> ....
>
> (q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier.

46 U.S.C. § 1304(2).

In support of this position, Hyundai provided the affidavits of the marine surveyors that the vertical lifting pad eyes were insufficient for lifting the cargo. The district court found: the pad eyes were an integral part of the cargo's packing for discharge; they needed repair; and any damage that occurred was *without* the fault or neglect of Hyundai. These findings are *not* clearly erroneous.

### 2.

Cross claims entitlement to approximately $12,000 in costs incurred when, in its view, Hyundai breached the bill of lading and refused delivery. Consistent with its above-described findings, the court concluded: Hyundai was *not* in breach; was justified in repairing the cargo; and had a valid possessory maritime lien. We agree.

B.

The demurrage disputes arise at the intersection of wharf demurrage, cargo liens, and storage fees for arrested property. The cargo was initially detained by Hyundai; then arrested by Cross; and, finally, arrested by Hyundai and TTO. But, throughout, it remained on TTO's wharf.

Wharf demurrage "is the rental charge made for the occupation of the facility until performance can be completed". *E.g., **City of Galveston v. Kerr Steamship Co.***, 362 F. Supp. 289, 294 (S.D. Tex. 1973), *aff'd*, 503 F.2d 1401 (5th Cir. 1974), *cert. denied*, 420 U.S. 975 (1975). And, the wharf has a maritime lien on the vessel for wharfage provided. *E.g., **The Western Wave***, 77 F.2d 695, 698 (5th Cir. 1935).

Cargo liens are possessory by nature, with the lien being lost if the cargo is delivered *unconditionally*. *E.g., **4,885 Bags of Linseed***, 66 U.S. (1 Black) 108, 109 (1861). The vessel is bound to the cargo and the cargo to the vessel, and the parties *may contract that the lien survives delivery*. *E.g., **The Bird of Paradise***, 72 U.S. (5 Wall.) 545, 555 (1866). Moreover, the vessel is entitled to retain and store *sufficient* cargo to secure its lien and to recover the cost of storing the cargo. *E.g., **The Asiatic Prince***, 103 F. 676, 677 (E.D.N.Y. 1900).

The United States Marshal storing arrested property is entitled to a reasonable storage fee. *See* 28 U.S.C. § 1921 (a)(1)(E). The pertinent provision, discussed *infra*, speaks of "actual" expenses.

- 9 -

Of course, the allowable cost for storing arrested property is conditioned on it being reasonable. In *Morgan Guar. Trust Co. of N.Y. v. Hellenic Lines, Ltd.*, 593 F. Supp. 1004, 1012 (S.D.N.Y. 1984), the court deviated from the wharf's published tariff and awarded the actual cost of storage. *Arauca*, 1940 A.M.C. 357, 358 (S.D. Fla. 1940), states that, when a vessel is under arrest and at a wharf, the court has the power to fix reasonable wharfage. Additionally, unnecessary or excessive charges incurred by the Marshal have been disallowed. *See* **The Captain John**, 41 F. 147 (E.D.N.Y. 1890); **The Perseverance**, 22 F. 462 (E.D.N.Y. 1884).

As a result of liens being employed and the cargo being arrested, TTO was storing the cargo on its wharf on account of three parties: (1) for Hyundai, initially securing a possessory maritime cargo lien for repairs, and later under arrest by the Marshal; (2) for Cross, under arrest by the Marshal in a possessory action; and (3) for itself, initially securing a possessory maritime lien for unpaid demurrage, and later, under arrest by the Marshal.

As discussed, it is reasonable to detain a portion of the cargo to secure a lien for unpaid freight. *See* **Gilbert Imported Hardwoods, Inc. v. 245 Packages of Guatambu Squares, More or Less**, 508 F.2d 1116, 1122 (5th Cir. 1975) (vessel justified in withholding 245 of 1081 packages to secure dispute over freight charges); **The Asiatic Prince**, 103 F. at 677 (vessel justified in retaining portion of cargo to secure its lien). As also discussed,

the vessel is entitled to recover from the cargo owner reasonable storage fees for cargo justifiably retained to secure a lien. *Id.*

The district court determined Hyundai's lien was initially $8,000 for the repair cost. With the costs related to the repairs added, the lien was for $21,000. The bill of lading listed the value of each winch as $25,000. And, by a July 1997 letter, Cross informed TTO it estimated the value of each winch as $22,500. Therefore, the district court held one winch would have secured the initial lien; but, in the light of Cross' refusal to bond the cargo out and prevent demurrage accrual, it held it would have been reasonable for Hyundai to retain possession of two winches to secure the lien. Accordingly, the court held Cross liable for demurrage, calculated according to TTO's tariff, for only two, instead of all 12, winches.

1.

a.

Cross contends it was TTO's fault demurrage was incurred, and, correspondingly, that TTO is *not* entitled to collect it from Cross. TTO was at fault, Cross claims, because it sided with Hyundai in the repair dispute by refusing to release the cargo without Hyundai's authorization.

Discharge of cargo from the vessel to the wharf creates, however, a bailment relationship, with the vessel (Hyundai) as bailor and the stevedore (TTO) as bailee. *E.g., **Leather's Best, Inc. v. S.S. Mormaclynx***, 451 F.2d 800, 812 (2d Cir. 1971). TTO could *not* be expected to deliver to Cross cargo it possessed as

- 11 -

bailee for the vessel, without the vessel's authorization, because the stevedore is liable for mis-delivery of the cargo. *Id.* Therefore, in refusing to release the cargo, TTO was fulfilling its legal duty to Hyundai, and acting in its own interest as bailee. It was *not* siding with Hyundai and, accordingly, is *not* at fault.

b.

Cross contends TTO was also at fault because it asserted a possessory maritime lien and later had the cargo arrested. Demurrage, as defined in TTO's tariff, is "a charge assessed against the cargo and/or containers remaining in or on terminal facilities after expiration of free time".  TTO was within its tariff to refuse to release the cargo until demurrage was paid. TTO was also entitled to assert a possessory maritime lien for services rendered to the cargo. *The Western Wave*, 77 F.2d at 698.

In sum, TTO was entitled to demurrage.  But, the amount due is at issue here.  TTO seeks $216,000; the district court awarded only $36,000.

2.

When need be, admiralty embraces the resources of equity. *Florida Bahamas Lines, Ltd. v. The Steel Barge "Star 800" of Nassau*, 433 F.2d 1243, 1248-49 (5th Cir. 1970).  In this regard, although "[a] maritime lien has great prestige[,] ... it is *not* an instrument of wrong".  *Id.* at 1250 (emphasis added).  Therefore, as in this case, admiralty courts can render judgments based on equitable principles.  *E.g., id.; Merrill-Stevens Dry Dock Co. v. M/V "Laissez Faire"*, 421 F.2d 430, 432 (5th Cir. 1970).

- 12 -

The district court invoked such principles when it stated: awarding demurrage in the amount of $216,000 for refusing to pay $8,000 for repairs would be "an *absurd legal result* and would *not* comport with this Court's *notion of justice*"; and, "after reflection on this matter the Court finds that a *fair* amount of demurrage is" $36,000.  (Emphasis added.)

a.

TTO claims $216,000 based on the following language in its published tariff:  "The *vessel[]* discharging the cargo ... [is] responsible for the payment of the demurrage charges before the cargo is removed from the wharf".  (Emphasis added.)  According to its tariff, TTO was entitled to detain the cargo until demurrage was paid; but, also according to the tariff, the vessel, *not the cargo owner*, is responsible for that payment.  Recovery of demurrage from the vessel, however, is *not* at issue.

In order to circumvent the plain language of its tariff, TTO maintains Cross consented to its application when it used the wharf.  But, Cross did *not* elect to offload at the wharf.  Hyundai did.  And, Hyundai elected to maintain possession of the cargo on TTO's wharf.

In sum, Cross did *not* expressly consent to the application of TTO's tariff; and, according to that tariff, Cross is *not* liable to TTO for demurrage.  Therefore, the tariff is *not* a basis for awarding TTO demurrage against Cross.

TTO maintains this is a distinction without a difference, asserting that, if Hyundai is liable to TTO for demurrage, the bill

- 13 -

of lading requires Cross to reimburse Hyundai.  But, again, TTO does *not* seek demurrage from Hyundai.  And, as noted, whether Cross must reimburse Hyundai for demurrage is *not* before us.  Instead, the demurrage issue at hand concerns the amount Cross owes TTO.

b.

TTO next contends that, as alternate custodian for the United States Marshal, it is entitled to recover storage fees pursuant to 28 U.S.C. § 1921(a)(1)(E):  "the United States marshal[] ... shall routinely collect, and a court may tax as costs, fees for the following: .... (E) The keeping of attached property ... *actual expenses incurred*, such as storage". (Emphasis added.)

TTO focuses on the words "the marshal shall", and "taxed as costs".  However, the word "may" gives the court discretion to tax such fees as costs.  Restated, the statute does *not* require the court to do so.

And, courts have disregarded published tariffs to award a reasonable fee.  For example, in **Morgan Guaranty**, ITO stored containers for seized vessels.  It sought storage fees according to its published tariff in the amount of $5.00 per day per container.  593 F. Supp. at 1011-12.  But, the court found the actual storage cost, which was only half that rate, was reasonable, and awarded that amount.  *Id*.  *See also* **Arauca**, 1940 A.M.C. at 358.

Moreover, "§ 1921 solely authorizes the marshal to obtain fees from the litigants for the costs of its services ... and provides no basis for authorizing payments to the litigants themselves".  **Midlantic Nat'l Bank v. Sheldon**, 751 F. Supp. 26, 30 n.1 (E.D.N.Y.

- 14 -

1990). Additionally, the statute does *not* instruct the Marshal from whom to collect the fees, or how to divide them, if the same property is being stored by two parties. It is for the court to assess the fees.

c.

Next, TTO contends Cross wrongfully seized the property and that, therefore, it can receive storage fees from Cross. TTO maintains: because Cross lost its possessory action, its seizure was wrongful; and, therefore, it is liable for demurrage. However, there was *no* finding that Cross wrongfully seized the cargo. Instead, as noted, the court ruled, as a matter of equity, that Hyundai and TTO needed to seize only two winches to adequately secure their liens.

d.

TTO relies on **Marastro Compania Naviera v. Canadian Maritime Carriers, Ltd.,** 959 F.2d 49, 53 (5th Cir. 1992), to support its claim that Cross owes the entire demurrage, even though there is *no* contract between them. In **Marastro**, a third party (neither the vessel nor cargo owner) seized the cargo while it was aboard Canadian's vessel in order to enforce a judgment against the cargo owner. (The vessel was *not* seized, but it was unable to depart because there was *no* suitable warehouse in which to offload the cargo. Additionally, because the cargo could *not* be offloaded, there was *no* way to offload only *sufficient* cargo to secure the lien.)

- 15 -

Canadian intervened, seeking damages for the delay to its vessel's operations caused by the arrest. The court determined that Canadian was entitled to recover *actual* damages so caused. **Id.** It also found that, although the vessel was an expensive storage facility, there was *no* alternative location for storing the cargo. It ruled it would be patently unfair — inequitable — to expect an innocent third party to bear the cost of such storage. The entire storage cost was awarded as reasonable. **Id.** at 53.

**Marastro** does *not* totally support TTO's position. Rather, it instructs that storage fees — demurrage — can be recovered from a third party at fault for the delay — an equitable remedy. TTO contends that Cross is solely responsible for the delay. But, Hyundai had previously exercised a possessory maritime lien, refused to release the cargo, and stored it on TTO's wharf. This does *not* include its seeking and receiving an October 16 warrant for the cargo's arrest.

Here, three parties were storing the attached cargo on TTO's wharf; and two, Hyundai and Cross, were parties to the initial dispute (the repairs). **Marastro**, which awarded the storage fees to the vessel — the innocent storage facility — on an equitable basis, does *not* instruct how to divide the storage cost if two parties are responsible. Logically, a court could use the same principles to award storage fees here, by assessing the costs equitably, according to which party was responsible for the fees being incurred. But, again, whether Hyundai is responsible for demurrage is *not* at issue.

e.

TTO contends Hyundai is under *no* duty to determine the reasonable amount of cargo to detain to secure the lien. TTO claims Hyundai had *no* way of knowing how much these previously heavily-used winches would bring at a Marshal's auction; and, therefore, Hyundai was justified in retaining the entire cargo. However, both TTO and Hyundai knew what value Cross placed on the individual cargo items; Hyundai had the bill of lading; TTO, the July 1997 letter.

### f.

Along the same lines, TTO claims Hyundai's lien applied to all 12 winches, because work was done on all 12, and a cargo lien does *not* survive delivery. TTO contends further that, if Hyundai had delivered ten winches to Cross, its lien on them would have been lost. (This does *not* explain why Hyundai would *not* release the remainder of the cargo — such as the brake bands.)

As noted, a cargo lien does not survive *unconditional* delivery of the cargo. But, the parties can contract otherwise. The bill of lading (the contract) for Cross and Hyundai states that the cargo lien survives delivery. Additionally, the parties can agree to have the cargo delivered to a warehouse for storage awaiting payment, with the vessel deemed to be in constructive possession. ***4,885 Bags of Linseed***, 66 U.S. (1 Black) at 114-15.

TTO then contends it was necessary to retain the entire cargo by drawing an analogy to the seizure of a vessel under a maritime lien. TTO states that, when so seized, the entire vessel is justifiably detained and the same rule should apply to the cargo.

It claims the vessel *cannot* detach only a portion of itself, such as a railing, and give it to the lienholder to secure the lien.

This position misses one basic difference between a vessel lien and a cargo lien, especially a cargo which included 12 large and easily divisible winches.  Each had independent value.

Finally, the district court found Hyundai was *not* maintaining possession of the entire cargo in good faith, but was instead using possession as leverage to force Cross to pay for the repairs.  That finding is *not* clearly erroneous.

In sum, the district court did *not* err in holding Cross responsible for *only* two of the 12 winches being detained, and correspondingly, liable for *only* two-twelfths of the demurrage.

### III.

For the foregoing reasons, the judgment is

*AFFIRMED*.