### In re MILLENIUM SEACARRIERS, INC., et al.

No. 02–10180.

United States District Court, S.D. New York.

March 25, 2002.

Jeremy J.O. Harwood, Alan M. Weigel, Healy & Baillie, L.L.P., New York City, for Omni Nav.

Thomas Kent, Orrick, Herrington & Sutcliffe, New York City, for Wayland Investment.

Jon Arnason, Holland & Knight, New York City, co-counsel for Wayland Investment.

Christopher F. Graham, Jonathan D. Forstot, Thacher, Proffitt & Wood, New York City, for debtors.

## MEMORANDUM OPINION
## AND ORDER

HAIGHT, Senior District Judge.

The captioned case is before this Court on an Order to Show Cause obtained on March 18, 2002 by Omni Navigation Ltd. ("Omni"), a Vanuatu corporation. Omni entered into a maritime contract of charterparty dated March 5, 2002 with Millenium Lady Inc., a Cayman Islands corporation and the owner of the M/S MILLENIUM MEXICO ("the MEXICO"). The charterparty called for the MEXICO to carry a cargo of grain from a Mississippi port to Trinidad.

Millenium Lady Inc. is one of a group of shipowning corporations bearing the first name "Millenium" which on January 15, 2002 filed voluntary petitions in the Bankruptcy Court for this District seeking relief under Chapter 11 of the Bankruptcy Code. Bankruptcy Judge Cornelius Blackshear is presiding over those petitions. Given this chronology, the charterparty of the MEXICO between Omni as charterer and Millenium Lady Inc. as owner is a post-petition contract. Unless the text states otherwise, "Millenium" in this Opinion refers to Millenium Lady Inc.

The Order to Show Cause procured by Omni directed Millenium to show cause why this Court should not enter an order (a) withdrawing from the Bankruptcy Court consideration of Millenium's assertion that the February 20 Order is applicable to the Wage Claim and Charter Claim under the circumstances and, upon due consideration; (b) permitting Omni, the Master, officers and crew of the M/V MILLENIUM MEXICO to exercise their rights to file an *in rem* action against the Vessel for any and all Lien claims they may have and seek security therefore [*sic*] by arrest of the Vessel in any amenable jurisdiction; (c) nominating an arbitrator on behalf of Millenium from the Society of Maritime Arbitrators, Inc.'s Roster of New York arbitrators, pursuant to the terms of the Charter, with the direction that the two appointed arbitrators agree to a Chair-

person who is available to issue an arbitration award prior to March 27, 2002, and that such arbitration take place forthwith . . . .

Service of the Order to Show cause was made upon Millenium and its general agent; Wayland Investment Fund, LLC ("Wayland"), which owns 85% of the Millenium group's secured bonds; and the United States Bankruptcy Trustee. The Order to Show Cause was returnable on March 20, 2002. The Court heard oral argument on that date from counsel for Omni in support of the requested relief, and from counsel for Millenium and Wayland, who opposed it.

Omni's requests for the particular forms of relief specified in the Order to Show Cause arose out of the circumstances which I will now describe.

## I. FACTUAL BACKGROUND

On March 8, 2002, the MEXICO, operating under the Millenium/Omni charterparty, completed loading her grain cargo at the P.V. Elevator on the Mississippi River and moved to the anchorage to take on bunker fuel supplied by Omni as charterer. But the MEXICO did not promptly set sail for Trinidad. Instead, the vessel's master told her local agent that he, his officers and crew were owed several months' wages through March 15 by Millenium and that the MEXICO would not sail for Trinidad until those wages were paid. After unsatisfactory exchanges with Millenium representatives, and under commercial pressure to deliver the grain in Trinidad, Omni paid the wage claims and took assignments of them from the master, officers and crew, thereby placing Omni in the position (not contested by Millenium or Wayland) of being able to assert a maritime lien for wages against the MEXICO *in rem* and a claim against Millenium *in personam.*

Following Omni's payment of the wage claims, the MEXICO sailed for Trinidad. On March 19 the vessel arrived at Port of Spain, Trinidad, where the cargo will be discharged. Discharging is estimated to be completed by March 26 at the earliest. Whether further wage-generated problems will arise remains to be seen.

In addition to the wage claims, which Omni asserts as assignee of the crew and also as a claim for breach of the charterparty, Omni asserts other charterparty claims against Millenium. These include the value of the unused bunkers on board after discharge, the fee of a classification society surveyor incurred for the voyage, port discharge dues, and various expenses attendant upon payment of the wage claims. Omni contends that these charterparty claims give rise to additional maritime liens against the MEXICO *in rem* as well as claims *in personam* against Millenium.

The charterparty contains an arbitration clause calling for the arbitration of disputes by a panel of three arbitrators, one to be appointed by Omni, one by Millenium, and the third chosen by the arbitrators appointed by the parties. Omni has appointed its arbitrator, Mr. Jack Berg, and has called upon Millenium to appoint its arbitrator. To date Millenium has not done so, which accounts for one of the forms of relief Omni seeks in its Order to Show Cause.

It is now necessary to describe certain events that have taken place in the bankruptcy case pending before Judge Blackshear.

As noted, the Millenium group of shipowning corporations filed their Chapter 11 petition in the Bankruptcy Court on January 15, 2002. At that time and subsequently, various Millenium vessels were trading in various waters. The MEXICO furnishes an example; she completed a

voyage to the United States on February 19, 2002, and Millenium chartered her to Omni on March 5.

On February 20, 2002, the Millenium group of corporations as Chapter 11 debtors-in-possession obtained an order from Bankruptcy Judge Blackshear that enjoined Millenium's creditors from, *inter alia*, "arresting, continuing to arrest, seizing, detaining, delaying and/or foreclosing upon any of the Debtors' Vessels." Judge Blackshear based that order upon a finding, recited in the preamble, that "serious, immediate and irreparable harm to the Debtors and their creditors has and will result from the arrest and/or continued arrest of any of the Debtors' Vessels."

Thereafter the Millenium debtors submitted to Judge Blackshear a motion dated February 28, 2002 for authorization, *inter alia*, to "sell substantially all of the debtors' assets free and clear of liens, claims and interests." Those assets consist principally of the Millenium group's vessels, including the MEXICO. The February 28 motion recited in ¶ 17: "Admiralty law, if applicable, permits the sale of the Debtor's assets, including a Vessel for the Fleet Assets, free and clear of maritime liens, and the Assets, including a Vessel or the Fleet Assets, may be sold free and clear of liens under Section 363(f) of the Bankruptcy Code." The motion contemplated an auction sale of the assets at the bankruptcy court at 2:00 p.m. on March 27, 2002, and directed that notice be sent to, *inter alia*, "all lien holders" and "all known creditors." ¶ 36.

Judge Blackshear signed an order on February 28, 2002 granting the motion, approving "the bidding, notice and objection procedures proposed by the Debtors," and directing that objections be filed not later than 3:00 p.m. on March 22, 2002.

Counsel for the Millenium debtors represent to this Court that the objections due on March 22 may include "the assertion of any liens, claims and interests in the assets to be sold." Brief at 3, ¶ 8. Wayland's brief at 2 echoes that representation ("In as much as the crux of Omni's argument is that it has a lien against Debtor Millenium Lady that is senior to all other lien holders, it can file a pleading to that effect and be heard together with all other claimants at the March 27th Hearing").[1] At oral argument on the present motion, counsel for Millenium said: "We have given notice to all the world. We have told people that if you have got a maritime lien, assert it by this Friday." Tr. at 31.

Apparently not satisfied with these provisions and procedures, Omni asks this Court, pursuant to 28 U.S.C. § 157(d), to withdraw the reference of the case to the Bankruptcy Court in respect of Omni's claims as assignee of the crew wage claims and Omni's other claims for breach of charter. The practical consequence of that withdrawal, as the Order to Show Cause explicitly recites, would be to enable Omni to arrest the MEXICO in an admiralty *in rem* action. Omni also asks that this Court, having withdrawn the reference, then compel Millenium to arbitrate any disputed claims under the arbitration clause in the charterparty.

Millenium and Wayland take the position that this Court should not interfere in any way with the proceedings in the Bankruptcy Court.

## II. DISCUSSION

■ Omni contends that withdrawal of the reference as to its claims is mandatory under 28 U.S.C. § 157(d). That section forms a part of the revisions to the Bank-

---

1. Strictly speaking, Omni claims a maritime lien for crew wages against the MEXICO, not against Millenium as the vessel owner.

ruptcy Code Congress enacted in 1984 in response to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). § 157(d) provides:

The district court may withdraw, in whole or in part, any case or proceeding referred under the section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

Withdrawal is mandatory, Omni argues, because the proceeding relating to the charterparty of the MEXICO requires consideration of "other laws of the United States," namely, admiralty law, with particular reference to the Federal Maritime Lien Act, 46 U.S.C. §§ 31301 *et seq.;* the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.;* and the Shipping Act, 46 U.S.C. §§ 2101 *et seq.,* which governs the payment of seamen's wages.

Two district courts in other circuits have concluded that the presence of an admiralty law question in a bankruptcy proceeding does not automatically mandate withdrawal of the reference under § 157(d). In *O'Hara Corp. v. F/V NORTH STAR,* 212 B.R. 1 (D.Maine 1997), a creditor brought an admiralty action *in rem* against a vessel and *in personam* against her owner to enforce a maritime lien. The United States Marshal seized the vessel and served process on her owner. Subsequently the owner filed a voluntary petition for liquidation under Chapter 7 of the Bankruptcy Code. The plaintiff in the admiralty action sought to have the reference withdrawn or, alternatively, for a lift of the automatic bankruptcy stay to allow the

immediate enforcement of the maritime liens. The district court refused to withdraw the reference, stating:

The only basis for mandatory withdrawal is the obvious fact that admiralty is involved here as well as bankruptcy. But the plaintiff offers no indication that substantive admiralty law will actually require other than pro forma attention and the vessel owner says the plaintiff's lien is uncontested. Thus, there is no cause for mandatory withdrawal.

212 B.R. at 2. The court also declined to exercise its discretion to require a permissive withdrawal, as contemplated by the first sentence of § 157(d). *Id.* at 3.

In *Adams v. S/V TENACIOUS,* 203 B.R. 297 (D.Alaska 1996), a creditor brought an admiralty action *in rem* and *in personam* to foreclose a preferred ship's mortgage and collect on the underlying debt. The sale of the vessel had not been confirmed at the time the debtor filed for Chapter 13 bankruptcy. The admiralty plaintiff moved in the district court for an order that the bankruptcy court had no jurisdiction over actions in admiralty regarding foreclosure of a ship's mortgages, so that the vessel would be sold by the district court sitting in admiralty and without regard to the pending bankruptcy. The district court refused to withdraw the reference to the bankruptcy court, reasoning that

[t]he Court no doubt has the authority to withdraw the reference and itself hear a motion for relief from stay. The Court, however, believes this is not an appropriate case in which to exercise that discretion. There are no disputed issues of fact or law which require consideration of admiralty law to resolve. The sole question is one of bankruptcy law, *i.e.,* whether a debtor should have additional time to pay her debt. Any consideration of admiralty law would therefore be routine. Thus, there is no

mandatory right to withdrawal. Nor, given the fact that this is a run-of-the-mill bankruptcy case, should the Court exercise its discretion to require a permissive withdrawal.

203 B.R. at 299 (citations omitted).

Omni contends that the rationale of these cases does not apply to the case at bar because the admiralty law and Federal Arbitration Act questions arising out of the MEXICO charterparty are so complicated, and the factual issues so bitterly disputed, that withdrawal of the reference is mandated by the second sentence of § 157(d). Evaluation of that contention depends in large measure upon the law of this circuit with respect to the respective powers and competencies of the District Court and the Bankruptcy Court. The Second Circuit recently considered that subject in *In re United States Lines, Inc.*, 197 F.3d 631 (2d Cir.1999), a case which Millenium and Wayland rely upon, and Omni neither cites nor discusses in its main and reply briefs.

United States Lines, Inc. and United States Lines (S.A.), shipowning corporations, filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code on November 24, 1986. The Bankruptcy Court approved a plan of reorganization on May 16, 1989, pursuant to which The United States Lines, Inc. and United States (S.A.) Inc. Reorganization Trust (the "Trust") became the successor-in-interest of the two original debtors.

The creditors included thousands of seamen who had sustained asbestos-related injuries while sailing on different ships in the debtors' fleet over four decades. Many additional such claims were expected to mature in the future. The debtors' vessels were covered by a number of Protection and Indemnity ("P & I policies") issued by several mutual insurance clubs ("the Clubs"). Disputes arose between the Trust and the Clubs with respect to the parties' respective rights under the P & I policies. Some of the P & I policies contained arbitration clauses. The Trust commenced an adversarial proceeding in the Bankruptcy Court seeking a declaratory judgment resolving those disputes. The Bankruptcy Court held that the Trust's declaratory judgment action was a "core" proceeding under 28 U.S.C. § 157(b)(1) and (2), and thus could be tried to binding judgment in that court. The Bankruptcy Court further concluded that it had discretion to deny certain of the Clubs' motions to compel arbitration under the arbitration clauses. The District Court, exercising appellate jurisdiction, reversed those rulings of the Bankruptcy Court and remanded the case, but certified its order of remand for interlocutory appeal under 28 U.S.C. § 1292(b). The Court of Appeals accepted the appeal, and reversed the District Court in the cited opinion.

In addressing the "core" question, Chief Judge Walker's opinion states that "[t]he bankruptcy court has core jurisdiction over claims arising from a contract formed post-petition under § 157(b)(2)(A)." 197 F.3d at 637–38. That statement resonates in the case at bar because the charterparty of the MEXICO between Millenium and Omni was entered into on March 5, 2002, after the Millenium group filed their Chapter 11 petition in January.[2]

2. The insurance policies at issue in *United States Lines* were entered into pre-petition, a circumstance that led to a limited disagreement between the three Circuit Judges on the panel and generated Chief Judge Walker's opinion for the Court and concurring opinions by Judges Newman and Calabresi. Chief Judge Walker expressed the view that whether a lawsuit alleging a post-petition breach of a pre-petition contract is a core proceeding depends on the impact the contract has on core bankruptcy functions. 197 F.3d at 638 n. 1. Judge Newman expressed his preference for "a bright-line rule that treats as core proceedings all suits alleging post-petition

While the P & I insurance policies involved in *United States Lines* were prepetition contracts, the Second Circuit regarded the declaratory judgment action addressing them as a core proceeding. The Court of Appeals stressed that " 'core proceedings' should be given a broad interpretation that is close to or congruent with constitutional limits as set forth in *Marathon*, and that *Marathon* is to be construed narrowly." 197 F.3d at 637 (citations omitted). Chief Judge Walker's opinion adds that "[c]ore bankruptcy functions of particular import to the instant proceedings include fixing the order of priority of creditor claims against a debtor," and "placing the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors." *Id.* (citations, internal quotation marks and ellipses omitted).

As for claims arising out of P & I policies containing arbitration clauses, the Clubs argued that the Bankruptcy Court lacked the power to enjoin arbitration and adjudicate the claims itself. The Bankruptcy Court rejected that argument, enjoined arbitration, and adjudicated all claims itself. The Court of Appeals affirmed. Chief Judge Walker's opinion acknowledged the public policy favoring arbitration inherent in the Federal Arbitration Act, and added that "[t]he arbitration preference is particularly strong for international arbitration agreements" (as were the P & I policies involved in the case). Nonetheless, the Second Circuit concluded that "there are circumstances in which a bankruptcy court may stay arbitration, and in this case the bankruptcy court was correct that it had discretion to do so . . . .

[W]e acknowledge its exercise of discretion and show due deference to its determination that arbitration will seriously jeopardize a particular core bankruptcy proceeding. We see no basis for disturbing the bankruptcy court's determination to that effect here." 197 F.3d at 640–41.

I think that the Second Circuit's *United States Lines* decision is instructive in the case at bar for two reasons. First, while core proceedings are subject to withdrawal of the reference under § 157(d), the Court of Appeals' reasoning reflects its preference to leave proceedings in the hands of the bankruptcy courts, particularly where (as in the present case) the bankruptcy court's adjudication of core claims will fix the priorities of creditors' claims and place the bankrupt's property "wherever found" under the control of the bankruptcy court. Second, where the contract in question contains an arbitration clause (as in the present case), the bankruptcy courts are competent to measure whatever tensions may arise between the Bankruptcy Code and the Federal Arbitration Act, and then decide whether to compel arbitration or decline to do so. That means, in the case at bar, that Omni could ask Bankruptcy Judge Blackshear to compel arbitration of its claims under the MEXICO charterparty.

I turn now to two opinions of Judge Sweet which consider the interrelationship of bankruptcy courts and district courts sitting in admiralty within the context of maritime liens: *Morgan Guaranty Trust Company of New York v. Hellenic Lines Limited,* 38 B.R. 987 (S.D.N.Y.1984) (*"Hellenic I"*), and *Morgan Guaranty Trust Company of New York v. Hellenic Lines Limited,* 585 F.Supp. 1227 (S.D.N.Y.1984) (*"Hellenic II"*).[3]

breaches of pre-petition contracts." *Id.* at 641. Judge Calabresi thought it unnecessary to answer that question and deferred the matter "to another day and to a case that raises the question squarely." *Id.* at 643. But all three members of the panel agreed upon those portions of the opinion which are instructive in the case at bar.

**3.** Judge Sweet had occasion to write a third opinion in this case, reported under the same caption at 593 F.Supp. 1004 (S.D.N.Y.1984).

Hellenic Lines, headquartered in New York, operated a fleet of vessels which called regularly at east coast U.S. ports. Having encountered financial difficulties, on December 12, 1983, Hellenic filed a petition of reorganization under Chapter 11 of the Bankruptcy Code. Prior to Hellenic's Chapter 11 filing, maritime lien claimants, CTI and ICS, "had arrested four Hellenic vessels in this jurisdiction, and at least one maritime lien claimant had arrested the freights, subfreights and charterhire of these and other Hellenic vessels." 38 B.R. at 989.[4] The four arrested vessels were the HELLENIC INNOVATOR, the HELLENIC IDEAL, the HELLENIC STAR, and the HELLENIC SPIRIT. In addition, on December 8, 1983, four days before Hellenic filed its bankruptcy petition, another maritime lien claimant, ITO, "obtained Warrants for Arrest *in rem* against the freights, subfreights, and charterhire" of 18 Hellenic vessels. *Hellenic I*, 38 B.R. at 990. Moreover, on December 12, 1983, the same day Hellenic filed its Chapter 11 petition, at ITO's bequest the freights earned by six Hellenic vessels on designated voyages "were arrested by the United States Marshal for the Southern District of New York." 585 F.Supp. at 1227. The Bankruptcy Court had lifted the automatic stay so that maritime lien claimants could proceed in the District Court against the vessels that had been arrested pre-petition; nonetheless, questions arose as to which court had jurisdiction over these claims and other maritime lien claims where the District Court's admiralty *in rem* jurisdiction had

not yet been perfected by an arrest within the district. All the maritime lien claimants argued that the jurisdiction of the District Court sitting in admiralty was exclusive.

The manner in which Judge Sweet resolved these jurisdictional issues is instructive. In *Hellenic I*, he dealt with what then appeared to be a shipowner's ongoing effort to reorganize under Chapter 11. Judge Sweet retained exclusive admiralty jurisdiction over the *in rem* claims against the four vessels that had been arrested pre-petition as well the *in rem* claims against those vessels' freights. However, as to "ITO's pending *in rem* action against freights, subfreights and charter hire of Hellenic vessels which have not been arrested in this jurisdiction," Judge Sweet concluded that "these freights are appropriately administered in the Bankruptcy Court"; he expressed his satisfaction that "the Bankruptcy Court can and will adjudicate the validity and priority of maritime liens asserted against Hellenic vessels and freights." 38 B.R. at 995.

When Judge Sweet came to decide *Hellenic II*, the Hellenic bankruptcy proceeding had been converted from a Chapter 11 reorganization to a Chapter 7 liquidation. That caused Judge Sweet to extend in one respect the exclusive jurisdiction of the District Court sitting in admiralty: "Since Hellenic is no longer in reorganization, I conclude that *custodia legis* should control and Hellenic should pay into the registry of this court all freights collected which

That opinion dealt solely with the allowance of administrative costs in respect of arrested vessels, and is not pertinent to the issues in the case at bar.

4. "Freights," "subfreights," and "charterhire" are forms of compensation a shipowner earns though the use of its vessels. Just as the maritime law gives maritime liens against

a vessel in respect of certain claims, enforceable by an admiralty action *in rem* against the vessel, an admiralty action *in rem* may also be maintained against the freights, subfreights, and charterhire earned by the vessel. *See United States v. Freights, etc., of Mount Shasta*, 274 U.S. 466, 47 S.Ct. 666, 71 L.Ed. 1156 (1927).

are subject to ITO's arrest." 585 F.Supp. at 1229.

Judge Sweet's thoughtful opinions in *Hellenic* are instructive in two respects. First, bankruptcy courts are perfectly capable of adjudicating maritime lien claims. In that regard *Hellenic I* reaches the same conclusion as the district courts in *O'Hara* and *Adams*, discussed *supra*. Second, a genuine tension between the jurisdiction of the bankruptcy courts and district courts sitting in admiralty comes into play only when a district court perfects its admiralty *in rem* jurisdiction through the arrest by the Marshal of a vessel or her freights. That is why, even in the liquidation context presented by *Hellenic II*, the District Court extended its admiralty jurisdiction only to those vessels and freights that had actually been arrested within the Southern District of New York. That point is relevant to the case at bar, because the sale of all the Millenium group's assets contemplated by Bankruptcy Judge Blackshear's order would appear to resemble a Chapter 7 liquidation more closely than a Chapter 11 reorganization.

It is well settled that a district court's admiralty *in rem* jurisdiction depends upon the arrest of the *res* under court process. "The foundation for the effective exercise of jurisdiction *in rem* is the taking of the vessel or other property that is the subject of the action into the custody of the court." 2 *Benedict on Admiralty* § 22 at 2–6 (7th ed. rev.2000). "Jurisdiction is the power to adjudicate a case upon the merits, and dispose of it as justice may require. As applied to a suit *in rem* for the breach of a maritime contract, it presupposes, first, that the contract sued upon is a maritime contract; and second, that the property proceeded against is within the lawful custody of the court." *The Resolute*, 168 U.S. 437, 439, 18 S.Ct. 112, 42 L.Ed. 533 (1897). "It is axiomatic that *in rem* jurisdiction exists in

an action only where the subject matter of the action, or an appropriate substitute thereof, is within the jurisdiction of the court in which the action lies. Thus, where a vessel is the target of an *in rem* action in admiralty, it must be both within the territorial jurisdiction of the court hearing the cause and subject to the order of the court through process of arrest." *American Bank of Wage Claims v. Registry of the District Court of Guam*, 431 F.2d 1215, 1218 (9th Cir.1970). "As a general matter, a court cannot make orders relating to or in aid of an *in rem* claim unless the *res* is within the court's jurisdiction." *Rolls Royce Industrial Power (India) v. M.V. FRATZIS M.*, 905 F.Supp. 106, 107 (S.D.N.Y.1995) (in admiralty action *in personam*, district court lacked jurisdiction to direct defendant shipowner to submit to expedited discovery for the sole purpose of ascertaining the whereabouts of the vessel so that *in rem* jurisdiction could be obtained by arresting her). In *Impala Trading Corp. v. Hawthorne Lumber Co.*, 200 F.Supp. 261 (S.D.N.Y.1961), District Judge Feinberg (as he then was) held that this Court lacked jurisdiction to order the sale of a cargo aboard ship in Puerto Cortez, Honduras, in order to conserve assets as security to satisfy plaintiff's asserted maritime lien against the cargo. Judge Feinberg regarded the basic issue as one of jurisdiction, and concluded that he lacked the power to make the order since neither the vessel nor the cargo were in this district.

These jurisdictional principles preclude this Court from granting the relief Omni seeks. While Omni argues mightily (and probably correctly) that it holds by assignment a high-ranking maritime lien for crew wages against the MEXICO, and reminds me that seamen are favored wards of the admiralty, and reminds me further that sales in admiralty are good against all the world, Omni has neither commenced an admiralty *in rem* action against the

MEXICO nor asked the Bankruptcy Court to lift the stay so it could do so. Accordingly there is no *res* presently within this district, admiralty jurisdiction *in rem* has not been obtained in this district, and this District Court lacks the power to make the sort of orders Omni requests.

That lack of jurisdictional power would still exist, it seems to me, even if I were to regard the maritime nature of Omni's claims against the MEXICO and Millenium as mandating a withdrawal of the reference under § 157(d). But I do not regard withdrawal as mandatory in this case. The first priority of Omni's principal lien claim, for crew wages,[5] is not disputed by Millenium. At oral argument counsel for Millenium, after saying of the fleet crews generally that "we have told our sailors that we are going to protect you. We are going to make sure you guys get paid. Make sure your liens are paid," Tr. 32, went on to address the Omni crew wage assignments specifically: "We believe that the secured creditor (Wayland) has a fourth priority lien. For example, crew is first, all right. And we believe that Mr. Harwood's [counsel for Omni] client, Mr. Harwood's clients, we believe to the extent that he took an assignment of the crew claim, he's in first place." Tr. 34–35. I do not doubt the Bankruptcy Court's ability to adjudicate properly a maritime lien whose first priority is undisputed; or, for that matter, to determine whether any other Omni claims give rise to maritime liens superior to that of Wayland or anyone else. In short, Omni may make whatever lien claims it wishes to the Bankruptcy Court, whose competence to adjudicate them I join the other district courts cited in this opinion (including Judge Sweet) in acknowledging.

There is another reason why the *in rem* jurisdictional principles I have discussed militate against a withdrawal of the reference and the granting of the relief for which Omni prays on this motion. The MEXICO is currently in Trinidadian waters, discharging her grain cargo. There is no telling when, if ever, the vessel will return to the waters of the Southern District of New York. An order of this Court, withdrawing the reference and purporting to confer upon Omni the future right to proceed somewhere, anywhere, by an action *in rem* against the vessel, would not only exceed this Court's jurisdiction for the reasons given by Judge Feinberg in *Impala Trading Corp., supra*, but would interfere with the Bankruptcy Court's ability to marshal and deal with all Millenium's property, recognized by the Second Circuit in *United States Lines* as a principal function of bankruptcy courts. Such interference would, in the circumstances of this case, be pernicious, and I decline to indulge in it.

For these reasons, Omni's motion is denied in its entirety.

It is SO ORDERED.

---

**5.** A lien for crew wages is a preferred maritime lien, 46 U.S.C. § 31301(5)(D), and as such takes precedence over a preferred ship mortgage lien, 46 U.S.C. § 31326(b)(1).