**GENERAL ELECTRIC CREDIT & LEASING CORPORATION, Plaintiff-Appellee,**

v.

**DRILL SHIP MISSION EXPLORATION, in rem, et al., Defendants,**

**Foods and Services, Inc., Claimant-Appellant.**

No. 81–3037.

United States Court of Appeals, Fifth Circuit.

Feb. 22, 1982.

---

Jack M. Alltmont, New Orleans, La., for claimant-appellant.

Monroe & Lemann, Nigel E. Rafferty, New Orleans, La., for General Elec.

Before CLARK, Chief Judge, RUBIN and TATE, Circuit Judges.

TATE, Circuit Judge:

A vessel was seized and sold upon foreclosure of a preferred ship mortgage. 46 U.S.C. §§ 951–54. The present appeal stems from proceedings to rank liens. The contest is between the seizing mortgage creditor ("General Electric") and an intervenor ("Foods Services") presenting claims advanced as priming the seizing creditor's right to the proceeds. Foods Services appeals from the denial of its claimed priority. Finding (a) that the intervenor's preseizure claims must be recognized as preferred maritime liens as advances of crew wages and (b) that the intervenor's post-seizure claims (for food catering services to the crew retained by the court-appointed keeper to maintain the vessel after the seizure, without objection of the creditor) should be recognized as *in custodia legis* expenses to preserve the vessel while it was under seizure, we reverse the district court's determinations to the contrary.

The skeletal facts are:

Prior to the seizure, by contract with the vessel's owner ("Mission"), the intervenor had furnished food catering services to the members of the crew on the vessel. The vessel was seized in early December 1977, while the vessel was docked near New Orleans. On joint petition of the owner Mission and the seizing creditor, General Electric, the captain and relief captain (employees of Mission) were appointed by the court as keeper and relief keeper. The uncontradicted testimony, though skimpy, is that the captain-keeper retained some members of the crew to perform duties on the vessel (such as pumping water from a leak) to maintain and preserve it and that he also called Foods Service and made arrangements for it to continue supplying food catering services to the members of the maintenance crew on the vessel. Foods Services continued to furnish food catering services to the crew through March 4, 1978. No court order was secured to authorize this expense. At the judicial sale on June 1, 1978, the seizing creditor purchased the vessel for approximately the unpaid amount due on its mortgage, it being authorized by the court to bid up to the amount due on its mortgage without making any payment, provided that it would guarantee the payment of any liens or claims superior in rank to its preferred mortgage.

Upon the foreclosure sale of a vessel, the preferred mortgage lien "shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses . . . allowed . . . by the court." 46 U.S.C. § 953(b). The intervenor contends (1) that its preseizure labor-wage costs are accorded priority as a preferred maritime lien for "crew wages" and (2) that its post-seizure catering services should be recognized as an "expense" of maintaining and preserving the vessel while it was within the custody of the court (*"in custodia legis"*).

(1) *Preseizure "crew wage" lien*

■ A recognized "preferred maritime lien" that primes a recorded preferred mortgage is one "for wages of the crew of the vessel." 46 U.S.C. § 953(a). One who advances money to pay crew's wages is

entitled to a maritime lien of the same rank. *International Paint Company, Inc. v. M/V Mission Viking*, 637 F.2d 382, 385 (5th Cir. 1981). The record reflects that the Foods Services employees performed aboard the vessel the food-preparation and cleaning services traditionally performed by seamen.

■ In a decision by this court, subsequent to the district court opinion,[1] we held under virtually identical circumstances that Foods Services employees were "crew members" entitled to the protection afforded by the "crew's wage" preferred maritime lien[2] and that Foods Services was subrogated to their claims as having advanced the money to pay crew's wages. *International Paint, supra*, 637 F.2d at 385–86. Foods Services is thus entitled to be paid in priority to the mortgage creditor for the net unreimbursed preseizure wages paid by it to its employees on the vessel, which are shown by the record without substantial dispute to amount to $62,689.16.

General Electric, the seizing creditor, does not dispute that *International Paint* requires recognition of this preferred maritime lien under present facts. General Electric contends, however, that by the contract between Foods Services and the owner, Mission, Foods Services had expressly waived any lien against the vessel—an issue allegedly not raised or passed upon in *International Paint*. General Electric relies upon a provision in the contract between Foods Services and the owner Mission by which Foods Services agreed to indemnify and hold harmless Mission "against all liens *and claims* for labor, material or . . . damages . . . arising out of . . . the activities of [Foods Services] . . . in connection with the work to be performed under this contract"[3] (emphasis supplied).

■ While a maritime lien may be waived, 46 U.S.C. § 974, a presumption arises that one furnishing services or supplies to a vessel acquired and did not waive a maritime lien. *Gulf Trading & Transportation Company v. Vessel Hoegh Shield*, 658 F.2d 363, 368 (5th Cir. 1981); *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.*, 261 F.2d 861, 867 (5th Cir. 1958). A party attacking this presumption has the burden of establishing that solely the personal credit of the owner or charterer was relied on and that the supplier purposefully intended to forego the valuable privilege of a maritime lien accorded by the law. *Id.*

■ No such express waiver of a maritime lien is shown by the contractual agreement by which Foods Services agreed to indemnify and hold harmless Mission "against all liens *and claims* for labor, material [etc.]" arising out of its activities in the performance of the contract. The apparent intent of the provision was to require Foods Services to indemnify Mission and hold it harmless as to claims by third persons against the owner, Mission, that arose out of Foods Services' activities related to the contract.

---

**1.** The district court, in affirming the magistrate's findings, found that in this instance the Foods Services' employees, although considered as seamen for some purposes, were not employees of the owner Mission so as to have a claim against the vessel for their wages. The district court, in finding that the catering employees had no claim for wages against the vessel *in rem* or the vessel's owner *in personam*, ruled that "if the persons alleged to be crew members can have no direct claim against the vessel or its owner for wages, then one who 'advances' such wages can have no better claim."

This reasoning was expressly rejected by the cited *International Paint* decision.

**2.** "Crew members employed by an independent contractor need this special protection just as do crew members employed directly by the ship." *International Paint, supra*, 637 F.2d at 385.

**3.** Art. VIII, par. 2 of the catering agreement provides:

Contractor [Foods Services] agrees to indemnify Company [Mission], owners, co-owners, or operators of leases and hold them harmless from and against all liens and claims for labor, material or claims for damages to persons . . . and to property, arising out of, in connection with, or resulting from the activities of Contractor, its employees and agents . . . in connection with the work to be performed under this contract. . . .

If the construction advanced by General Electric were adopted, by the agreement Foods Services not only expressly waived any *"liens"* that might result in its favor through performance of the contract, but also any *"claims"* it thereby acquired. Obviously, Foods Services did not intend to waive any right whatsoever to payment of its "claims" under the contract. For paralleling reasons, we cannot ascribe any like express waiver by Foods Services of maritime "liens" arising in its own favor should Mission not pay it for its performance of the contract. Within the intention of the indemnify-hold-harmless clause, therefore, Foods Services is asserting a lien against the vessel arising in its own favor as a result of the nonpayment by Mission for contractual services performed.[4] Accordingly, we find no express waiver of the preferred maritime lien arising in favor of Foods Services because of its preseizure payment of wages of the crew.

(2) *"Custodia legis" expenses*

The "expenses and fees allowed and costs taxed, by the court," insofar as arising out of the foreclosure proceedings and administering the custody of the vessel, are paid in priority to the preferred mortgage lien. 46 U.S.C. § 953(b). The expenses of maintaining and preserving the vessel after it has been seized under legal process— while it is *in custodia legis*—are included within this priority. While it is preferable to secure a court order authorizing this expense before incurring it, nevertheless even in the absence of court order these *"custodia legis* expenses" may be ordered by the court to be paid in priority to the seizing mortgage creditor if "equity and good conscience" so require. *New York Dock Company v. The Poznan*, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927); Gilmore and Black, The Law of Admiralty § 9–11 (2d ed. 1975); Comment, Developments in the Law of Maritime Liens, 45 Tul.L.Rev. 574, 579–81 (1971).

Foods Services claims that, by reason of this principle, it is entitled to receive such priority payment as *custodia legis* expenses of the catering services afforded to the crew that remained on board—at the direction of the court-appointed keeper and without objection by the seizing creditor General Electric—to maintain and preserve the vessel while it was under seizure. As noted earlier, these catering services included not only the food itself, but also the labor costs related to its preparation and the incidental crew-serving functions of the catering contract. The unpaid invoices for this claim amount to $18,278.10, and we do not understand that there is any contest as to this amount, if indeed it is entitled to recognition as a *custodia legis* expense.

In disallowing the claim, the magistrate acknowledged that if the claim were for "provisions" furnished the custodial crew, then equity and good conscience require that Foods Services be reimbursed for this as a *custodia legis* expense. However, essentially for the same reasons that the magistrate had denied the Foods Services preseizure wage costs as a crew wage lien (reasoning that we have disapproved, see (1) *supra*), he disallowed the claim.[5]

---

4. We are further doubtful that Foods Services' agreement to "indemnify and hold harmless" Mission from liens resulting from its contractual performance constituted an "express waiver", such as is recognized by the decisional law, of any liens thereby created against the vessel. We need not, however, discuss nor decide this issue.

5. The magistrate also observed that Foods Services "must overcome any argument that those [custodial crew members] remaining on board used the services available." In affirming the magistrate's report, the district court briefly summarized its finding "that the services were not necessary to the preservation of the vessel and noted that the vessel and its crew survived for some time after Foods Services ceased providing its services. His [the magistrate's] findings are not clearly erroneous."

Without contradiction, the record reveals that the Foods Services catering services were rendered to the custodial crew, supported by detailed invoices showing by each crew-member's name the meals served, etc. The record establishes that the custodial crew performed services preserving the vessel entitled to recognition as *custodia legis* expenses, and payment of these crew wages was not contested in these proceedings (even though initially incurred by the captain-keeper without court order). That

■■ The more usual rule is that services or property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court or of an officer of the court (here, the keeper) acting within his authority, should be allowed as a *custodia legis* expense. *New York Dock Company v. The Poznan, supra,* 274 U.S. at 121, 47 S.Ct. at 484; *see, e.g., Payne v. S.S. Tropic Breeze,* 423 F.2d 236, 239–40 (1st Cir., 1970); *China Union Lines, Ltd. v. A. O. Andersen & Co.,* 364 F.2d 769, 794 (5th Cir. 1966); *Turner & Blanchard, Inc. v. S.S. Emilia,* 322 F.2d 249, 250 (2d Cir. 1963); *Moore v. United States,* 302 F.2d 918 (D.C.Cir.1962); *Bender Welding and Machine Co., Inc. v. M/V Sovereign Opal,* 415 F.Supp. 772 (S.D. Ala.1976). Here, the catering services furnished by Foods Services to service the custodial crew were as necessary to maintain and preserve the vessel as were the services of the custodial crew itself (see note 5), and there is no claim that their cost was unreasonable in amount.

Foods Services' claim for these catering services should therefore be recognized as *custodia legis* expenses, if indeed (as is contested by General Electric) the services were approved or directed by the court-appointed keeper (the captain) of the vessel. Despite General Electric's argument to the contrary, the record as a whole supports that the keeper had indeed requested continuance of the catering services, as well as that the seizing creditor General Electric knew or should have known that a custodial crew (that must be fed) was used and necessary to maintain and preserve the vessel under seizure.[6] Foods Services' claim should be recognized.

### (3) Prejudgment interest

Foods Services also contended in the trial court that it was entitled to be awarded prejudgment interest on all amounts recovered. Evidence was taken on this issue. However, the district court did not reach it, since it concluded that Foods Services was not entitled to recovery.

■■ The general rule is that, although an admiralty court has discretion to grant or to deny prejudgment interest, such interest should be awarded absent peculiar circumstances. *International Paint, supra,*

the services performed by Foods Services were necessary to the preservation of the vessel is inferentially, if not expressly, supported by the joint motion of General Electric and Mission, after Foods Services had terminated its uncompensated services, that requested the court to approve General Electric's advancing as *custodia legis* expenses to maintain the vessel certain costs; these included custodial crew wages and the costs of a food catering service to furnish meals (at the same price as had Foods Services) to the crew. Record, II, pp. 10–11 (motion), pp. 473–74 (itemized statement; "provisions" explained as food catering costs, p. 474). We can only assume that the previous courts overlooked these uncontradicted showings or else, more probably, essentially based their conclusion upon the reasoning utilized in disallowing the preseizure wage costs; that Foods Services, as an independent contractor, furnished catering services at its own risk and in reality relied upon the credit of the owner (Mission) rather than upon any right accorded them by maritime law. We have in the text followed, instead, the reasoning of *International Paint, supra,* which rejected such an analysis.

**6.** The parties dispute whether or not the captain, who upon joint motion was appointed as keeper and was placed in control of the vessel during seizure, had directly requested Foods Services to continue providing catering services after the seizure. While neither the captain nor the relief captain (appointed as master and as relief master respectively) appeared before the court, there was evidence in the record (1) that Foods Services knew of the seizure (1st Supplemental Record, Tr. 125–26), (2) that it was asked by the captain to continue to perform catering services (Tr. 126), (3) that at that time meals were supplied on "an as needed or as ordered basis" (Tr. 25, 48), (4) that Foods Services' employees were required to request permission of the vessel to come aboard each time (Tr. 75), (5) that General Electric had jointly requested that the vessel be placed, by court order, under the authority of the captain and relief captain (R. II, p. 27), (6) that General Electric had jointly moved (although subsequent to termination of the Foods Services performance) that it was necessary that a maintenance crew be kept aboard the vessel at all times, and provided with supplies, including food catering services (R. II, pp. 471 et seq.), (7) that the work being done aboard the vessel was for the maintenance or preservation of the ship, (Tr. 74–79), and (8) that the captain and relief captain were among those crew members actually fed by Foods Services (Tr. 78–79).

637 F.2d at 386. Under virtually identical circumstances, in that cited decision this court ordered an award of prejudgment interest despite the district court's denial. Accordingly, Foods Services is entitled to an award of prejudgment interest " 'as compensation for the use of [its] funds.' " *Id.*

The rate at which the interest should be charged, and possible credits against it, are contested by the parties. Since the district court has not had an opportunity to resolve these factual disputes between the parties, as in *International Paint* (see clarifying per curiam, 642 F.2d 160 (5th Cir. 1981)), we will remand this issue to the district court for its determination.

*Conclusion*

Accordingly, we REVERSE the judgment of the district court insofar as it denied priority payment to the intervenor Foods Services claims for its crew-wage lien in the amount of $62,689.16 and for its *custodia legis* expense of $18,278.10, and we order that judgment be entered in favor of the intervenor on these claims. We REMAND this case to the district court for it to determine and to award prejudgment interest in the appropriate amount.

REVERSED IN PART, REMANDED IN PART.