UNITED STATES of America,
Plaintiff,

and

AUSTAL USA LLC; Hornblower Marine Services, Inc.; HMS–Hawaii, Inc., Intervenor–Plaintiffs,

v.

ALAKAI (O.N. 1182234), its boilers, engines, machinery, masts, spars, rigging, boats, anchors, cables, chains, tackle, tools, bunkers, pumps and pumping equipment, apparel, furniture, fittings and equipment, spare parts, and all other appurtenances, etc., in rem, Defendant.

Action No. 2:10cv232.

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 28, 2011.

Edmund M. Ferguson, U.S. Department of Justice, Washington, DC, for Plaintiff.

Eugene Paul Miller, John Louis Longstreth, Rolf Marshall, K & L Gates LLP, Washington, DC, Richard Hooper Ottinger, Vandeventer Black LLP, Norfolk, VA, Donald Kenneth McLean, Bauer Moynihan & Johnson LLP, Seattle, WA, for Intervenor–Plaintiffs.

## OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on the following motions: the United States of America's Motion for Summary Judgment Pursuant to F.R.C.P. 56 and Distribution of Sale Proceeds ("Motion"); Austal USA LLC's Cross–Motion for Summary Judgment ("Austal's Cross–Motion"); and Hornblower Marine Services, Inc. and HMS–Hawaii, Inc.'s Motion for Summary Judgment to Set Priority of Claims ("Hornblower and HMS's Cross–Motion"). For the reasons stated below, the Motion is **GRANTED,** in part, and **DENIED,** in part; Austal's Cross–Motion is **DENIED;** and Hornblower and HMS's Cross–Motion is **GRANTED,** in part, and **DENIED,** in part.

## I. PROCEDURAL HISTORY

The United States of America ("United States") filed the present action on May 20, 2010, seeking to foreclose a Preferred Mortgage Lien on the defendant vessel, the ALAKAI, Official No. 1182234 ("the Vessel"). The United States Marshal ("Marshal") arrested the Vessel on May 25, 2010, pursuant to process issued by this court on May 20, 2010. On August 26, 2010, Austal USA LLC ("Austal"), Hornblower Marine Services, Inc. ("Hornblower"), and HMS–Hawaii, Inc. ("HMS") all intervened in the action to foreclose their respective liens.

On September 17, 2010, the court ordered the interlocutory sale of the Vessel by public auction, free and clear of all claims, liens, maritime liens, rights, rights of redemption and encumbrances. The court authorized the United States to credit bid at the sale up to the maximum of its mortgage interest on the Vessel. In the

event the United States was the successful bidder by way of a credit bid, the court ordered that (1) the amount of the United States' bid would be considered maintained in a fund by the United States Maritime Administration ("MARAD") as the proceeds of sale pending further Order of the court; and (2) the United States would be required to pay all claims adjudged to be entitled to payment out of the proceeds of the sale, though not exceeding the amount of its bid.[1] On September 30, 2010, the Vessel was sold at auction for $25,000,000 to MARAD. On October 7, 2010, the Clerk of the Court entered an Order of Confirmation of Sale of the Vessel, and on October 13, 2010, the Marshal conveyed a Bill of Sale to MARAD. Default was entered against the Vessel on November 8, 2010.

On November 5, 2010, the United States filed an unopposed Motion for Disbursement of Funds for *Custodial Legis* Expenses. On November 23, 2010, the court entered partial summary judgment for the United States and ordered that $351,764.79 of the proceeds of the Vessel's sale be distributed to MARAD, leaving $24,648,235.21 remaining in the proceeds fund. On November 19, 2010, the United States filed its Motion. On December 10, 2010, Austal filed an Opposition to the

Motion and its Cross–Motion,[2] and Hornblower and HMS filed their joint Cross–Motion. On December 17, 2010, the United States filed its Reply to Austal's Opposition to the Motion, its Response to Austal's Cross–Motion,[3] and its Response to Hornblower and HMS's Cross–Motion. Austal, Hornblower and HMS did not reply to the United States' Responses to their respective Cross–Motions. The Motion and the Cross–Motions are now ripe for review.

## II. FACTUAL HISTORY [4]

Unless otherwise noted, the following facts are admitted.[5]

### A. THE UNITED STATES AND AUSTAL

Although differing in the particulars, both the United States and Austal financed construction of the Vessel. On April 9, 2004, Austal and Hawaii Superferry, Inc. ("HSF") entered into a contract for the construction of two vessels, one of which would become the Vessel.[6] On the same day, the two entered into a Subordinated Loan Agreement under which Austal committed to provide partial financing for the construction of the Vessel and HSF issued promissory notes to Austal. By its terms,

1. In the Order for Interlocutory Sale, the court expressly reserved judgment on the priorities of the parties' claims. Order for Interlocutory Sale of Vessel 8 n. 3, ECF No. 39.

2. Austal's separately filed Opposition to the Motion is identical to its Cross–Motion.

3. The United States' separately filed Reply to Austal's Opposition to the Motion is identical to its Response to Austal's Cross–Motion. *See supra* note 2.

4. The court need not review the full factual history of the Vessel and its sister ship, the HUAKAI, in order to resolve the pending motions. Additional information regarding the

Vessel can be found in the parties' complaints as well as in *In re HSF Holding, Inc.*, 421 B.R. 716 (Bankr.D.Del.2010).

5. In determining whether a genuine issue of material fact exists, "the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va. Loc. Civ. R. 56(B); *see also* Fed.R.Civ.P. 56(e).

6. The other Vessel is the HUAKAI, the defendant in a parallel proceeding in this court. *See United States v. HUAKAI*, 2:10cv233 (E.D.Va.2010).

the Subordinate Loan Agreement was entered under conditions that "ensure[d] the subordination of [Austal's] rights hereunder to the rights of [the United States] under the Senior Loan Documents." Subordinated Loan Agreement 1, Mem. in Opp. to Austal's Cross Mot. for Summ. J. Ex. C, ECF No. 71–1. In October of 2005, the United States, represented by the Secretary of Transportation and acting by and through MARAD, and HSF entered into a Commitment to Guarantee Obligations ("Guarantee Commitment") that bound the United States to guarantee the payment of a portion of HSF's financial obligations pertaining to construction of the Vessel. Thereafter, HSF obtained a loan to fund construction costs, pursuant to which it issued two promissory notes guaranteed by the United States. HSF later refinanced its obligations under the construction loan and the promissory notes by issuing and selling long term bonds guaranteed by the United States.

HSF provided security to Austal and to the United States by executing and delivering mortgages that covered the Vessel as of its May 30, 2007 completion and delivery date. As to the United States, HSF executed a First Preferred Fleet Mortgage ("First Mortgage"). As to Austal, HSF executed a Second Preferred Fleet Mortgage ("Second Mortgage"). Congruent with Austal's subordination of its rights to those of the United States under the Subordinated Loan Agreement, the Second Mortgage provided that it was "fully subject to and fully subordinate to the [United States' First Mortgage]." Second Preferred Fleet Mortgage 13, Mem. in Supp. of United States' Mot. for Summ. J. Ex. B, ECF No. 61–2 [hereinafter "Second Preferred Mortgage"]. At 10:15 AM on May 30, 2007, Austal and HSF agreed construction of the Vessel

was complete. At that same moment, both the First and Second Mortgages were properly filed with the Coast Guard's National Vessel Documentation Center, thereby attaining preferred mortgage status. *See* 46 U.S.C. §§ 31321(a); 31322.

On May 30, 2009, HSF filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On July 1, 2009, the bankruptcy court ordered that the Vessel could be abandoned and modified the automatic stay to allow HSF's secured creditors to enforce their rights directly against the Vessel. Various defaults occurred under the First Mortgage before and after the bankruptcy petition. Significantly, in December of 2009, the United States made payment in full on HSF's guaranteed obligations and no sums have been paid to the United States under the First Mortgage. Currently, the Vessel is liable to the United States for in excess of $148,000,000. Similarly, Austal advanced sums pursuant to the Subordinated Loan Agreement and promissory notes, yet has not received any payment from HSF. As of the date Austal filed its Cross–Motion, the Vessel is liable to Austal for $30,312,046.31.

## B. HORNBLOWER AND HMS

In June of 2004, HSF contracted with Hornblower and HMS to manage the Vessel and to hire crewmembers ("Management Agreement").[7] Prior to completion of the Vessel's construction on May 30, 2007, HMS provided HSF with services to obtain necessary permits and documentation for the Vessel. HMS provided other services for the Vessel from the date of its completion until May 1, 2009. On May 1, 2009, HSF owed HMS $108,598.82 for services and $2,709.89 for the medical expenses of an injured crew member. Subsequently, Hornblower renegotiated the

---

7. HMS is a subsidiary of Hornblower.

Management Agreement with HSF for the continuation of vessel management services. Hornblower is owed $30,050.00 for those vessel management services. Under the renegotiated Management Agreement, HSF was obligated to pay the crew costs associated with the crew that was required on the Vessel. When HSF failed to pay the crew costs, Hornblower advanced $21,025.00 to cover those payments.

## III. STANDARD OF REVIEW

■ Summary judgment is appropriate when a court, viewing the record as a whole finds that there is no genuine issue of material fact and that one party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.,* 763 F.2d 604, 610 (4th Cir.1985). "[W]hen faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993); *see ITCO Corp. v. Michelin Tire Corp., Commercial Div.,* 722 F.2d 42, 43 n. 3 (4th Cir.1983). Instead, the court must ask "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *see also Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003) ("[T]he court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" (citations omitted)). The court is not to "weigh the evidence and determine the truth of the

matter." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## IV. ANALYSIS

There is no dispute that the proceeds of the sale are insufficient to satisfy all of the parties' claims.[8] The United States maintains that, by virtue of its First Mortgage, it is entitled to all of the proceeds and, therefore, need not pay any portion of the other claims. Austal contends that its Second Mortgage has equal priority with the First Mortgage, thus the United States must pay Austal its proportionate share. Hornblower and HMS contend that they possess preferred maritime liens, and thus the United States must pay their claims before applying any proceeds to satisfaction of the First and Second Mortgages. *See* 46 U.S.C. § 31326(b)(1) ("[A] preferred mortgage ... has priority over all claims against the vessel (except for ... preferred maritime liens")).

### A. THE UNITED STATES' AND AUSTAL'S RESPECTIVE PREFERRED MORTGAGES

There is no dispute that both the United States and Austal obtained valid preferred mortgages on the Vessel, *see* 46 U.S.C. §§ 31321–22, and no genuine issue of material fact as to the relative priorities of those mortgages. The United States and Austal agree that their mortgages were recorded with the Coast Guard at the exact same moment. There is no dispute as to the terms of the mortgages and that, under those terms, HSF is in default. The dispute is merely as to the interpretation of those facts, and, thus, is appropriate for summary judgment.

8. Upon the sale of the Vessel pursuant to the court's September 17, 2010 Order, all claims were terminated as to the Vessel and attached, "in the same amount and in accordance with their priorities to the proceeds of the sale." 46 U.S.C. § 31326.

Austal contends that priority must be determined solely based upon the timing of the mortgages' recordation. Indeed, priority between mortgages is generally determined based on the timing of recordation with the Coast Guard. *See, e.g., Westinghouse Credit Corp. v. O/S Dorothy Claire,* 732 F.Supp. 59, 61 (E.D.Tex.1989). It is remarkable that the Coast Guard recorded the mortgages at the exact same moment, but the record is clear. Accordingly, if there is no other evidence in the record regarding priority, the Second Mortgage should be treated in *pari passu* with the First Mortgage, thus entitling Austal to a proportionate share of the proceeds. *See* 46 U.S.C. § 31321(a)(2); *cf. The Thomas Barlum,* 293 U.S. 21, 55 S.Ct. 31, 37, 79 L.Ed. 176 (1934); *Morse Dry Dock & Repair Co. v. The Northern Star, et al.,* 271 U.S. 552, 46 S.Ct. 589, 590, 70 L.Ed. 1082 (1926) ("[T]he statute taken literally may work harshly if by any oversight or otherwise the collector [charged with filing liens] does not do his duty ... [b]ut the words of the statute seem to use too clear to be escaped ... and there is nothing for the courts to do but to bow their heads and obey."). The United States offers the Second Mortgage as other evidence regarding priority. It argues that the subordinating provision in the Second Mortgage establishes the priority of the First Mortgage. Austal insists that provision does not control disposition of this matter because neither the Second Mortgage nor the Subordinated Loan Agreement evince an intent to subordinate the Second Mortgage beyond payment of the guarantees, HSF's bankruptcy, and the arrest of the Vessel. Austal also argues that it would be "inequitable" for the court to award the United States proceeds without awarding Austal a pro rate share. Mem. in Supp. of Austal's Cross–Mot. for Summ. J. 1, ECF No. 66; *see also id.* at 11–12. The court will not consider this latter argument because it cannot countenance a method of determining priorities that applies equitable principles. *See Transamerica Commercial Fin. Corp. v. F/V Smilelee,* 944 F.2d 186, 189 (4th Cir. 1991) ("The principles protecting priority of a mortgage are legal, not equitable, in nature." (citing the predecessor to 46 U.S.C. § 31326)). The court looks to the terms of the Second Mortgage to determine whether it is subordinate to the First Mortgage notwithstanding their simultaneous recordation.[9]

As a threshold matter, the court notes that subordination provisions are enforceable under governing law. The Second Mortgage provides that it is:

> [G]overned by and construed in accordance with the general maritime laws of the United States of America to the extent applicable, and, to the extent that such laws are not applicable, the laws of the State of New York as applied to contracts made and performed within the State of New York, without regard to principles of conflicts of law.

Second Preferred Mortgage 12. Federal maritime law certainly governs aspects of preferred mortgages, but it does not exhaustively regulate their treatment.[10] Im-

9. Austal and the United States both address the import of the Subordinated Loan Agreement. Austal is correct that it does not resolve the issue and the United States is correct that it does not bestow Austal with additional rights to the proceeds. The court expresses no opinion regarding either parties' proof in that regard because it is sufficient to note that the Subordinated Loan Agreement does not control, let alone inform, the court's analysis.

10. Preferred mortgages are creations of federal maritime law. *See* 46 U.S.C. § 31322; *Nat'l Bank of Fayette Cnty. v. Enter. Marine Dock Co.,* 43 F.2d 547, 547 (4th Cir.1930); *see also All Alaskan Seafoods, Inc. v. M/V Sea*

portantly, it does not govern the relative priority of multiple preferred mortgages on a vessel.[11] *See* 46 U.S.C. § 31326(b) (governing the priority of preferred mortgages in relation to other types of liens, but providing that claims otherwise attach "in accordance with their priorities"). As such, the Second Mortgage's subordination provisions are governed and construed according to New York law. *Cf. Ost–West–Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir.1998) ("[I]n an admiralty case, a court applies federal common law and can look to state law in situations where there is no admiralty rule on point."). Under New York law, subordination clauses in mortgages are valid and enforceable. *See Equitable Life Assur. Soc. Of United States v. Britton Realty Corp.*, 37 N.Y.S.2d 85, 87 (N.Y.Sup.Ct.1942); *Matter of Vill. Rathskeller, Inc.*, 147 B.R. 665, 672–73 (Bankr. S.D.N.Y.1992). Accordingly, the court will enforce the subordination provision unless it is inapplicable to this matter.

██ Article V of the Second Mortgage contains the pertinent subordination provision: [12]

Anything herein to the contrary notwithstanding, this Mortgage is fully subject to and fully subordinate to the First Preferred Fleet Mortgage, and *the ... priorities ... granted to the Mortgagee herein are fully subject to and are fully subordinate to the corresponding ... priorities ... granted to the First Mortgagee under the First Preferred Fleet Mortgage* and may not be exercised in such a manner as to impair or prejudice such ... priorities ... except as provided in this Article V.

*Id.* at 13 (emphases added).[13] Austal claims this unambiguous language does not apply here because another provision in Article V states that Austal can exercise its rights and remedies under the Second Mortgage if the "Vessel shall have been seized or arrested" or if the shipowner commences bankruptcy proceedings, *id.*, and both these contingencies occurred. Contrary to Austal's characterization, this provision does not "allow[ ] Austal to proceed without deference to the [First] Mortgage." Mem. in Supp. of Austal's Cross–Mot. for Summ. J. 11. It merely permits Austal to intervene in this action to foreclose its Second Mortgage. There is no language in the Second Mortgage that qualifies the subordination of the Second Mortgage to the First Mortgage.[14] The

*Producer*, 882 F.2d 425, 428 (9th Cir.1989) ("The statutory mortgage, sometimes referred to as a preferred ship mortgage, was created to encourage investment in the shipping industry." (citations omitted)).

11. Moreover, subordination provisions in preferred mortgages do not contradict federal maritime law. *Cf. Prudential Ins. Co. of Am. v. S.S. Am. Lancer*, 870 F.2d 867, 869–71 (2d Cir.1989) (affirming district court's order that prioritized one preferred mortgage over another pursuant to a subordination clause in the second preferred mortgage); *cf. also Morse Dry Dock*, 46 S.Ct. at 590; *State of Israel v. Motor Vessel Nili*, 435 F.2d 242, 246–50 (5th Cir.1970) (holding that a lien preclusion clause is unenforceable if it defeats the protections of the subordinating provisions in the predecessor to 46 U.S.C. § 31326); *Rock-*

*port Yacht & Supply Co. v. M/V Contessa*, 209 F.Supp. 396, 398–99 (S.D.Tex.1962).

12. Article V is entitled "Subordination to the First Preferred Fleet Mortgage." Second Preferred Mortgage 12.

13. The Second Mortgage's Recitals provide that "[t]he First Mortgagee has consented to the Shipowner granting this Mortgage on the Vessel to the Mortgagee, *provided this Mortgage is subordinated to the First Preferred Fleet Mortgage upon the terms contained in Article V of this Mortgage.*" *Id.* at 1 (emphasis added).

14. Indeed, Article V expressly disclaims Austal's interpretation:

*Notwithstanding any other provisions of this Mortgage, ... the Mortgagee shall not take*

court is satisfied that the subordination provision in the Second Mortgage is applicable to this matter, and, thus, **FINDS** that the First Mortgage has priority over the Second Mortgage to payment out of the proceeds of the Vessel's sale.

### B. HORNBLOWER AND HMS'S CLAIMS

Hornblower and HMS seek to establish their right to priority payment over the First and Second Mortgages on the grounds that they each hold preferred maritime liens. *See* 46 U.S.C. § 31326(b)(1). Specifically, they maintain that Hornblower has a preferred maritime lien for wages paid to the Vessel's crew, HMS has a preferred maritime lien for cure, and both have a preferred maritime lien for necessaries. Only the United States addresses those claims in its briefs; Austal takes no position. The court addresses each claim in turn.

### 1. CREW WAGES

Hornblower alleges that it is entitled to priority payment of $21,025.00 out of the proceeds because it is subrogated to the crew's lien for unpaid wages in that amount. Indeed, under 46 U.S.C. § 31301, claims for crew wages can be preferred maritime liens,[15] and under, 46 U.S.C. § 31326(b)(1), preferred maritime liens are entitled to priority over any preferred mortgages.[16] *See, e.g., The Eastern Temple*, 94 F.2d 374, 376 (4th Cir.1938). Furthermore, one who advances funds used to discharge such a lien can, generally, bring an *in rem* claim against the vessel for those wages. *See, e.g., Medina v. Marvirazon Compania Naviera, S.A.*, 709 F.2d 124, 125 (1st Cir.1983) (citing *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1207 (5th Cir.1978); G. Gilmore & C. Black, The Law of Admiralty §§ 9–20, 9–21 (2d ed. 1975) and 2 Benedict on Admiralty §§ 32, 33 (7th ed. 1982)); *see also* Fed R. Civ. P. Supp. R. for Admiralty or Maritime Claims (C)(1).

Hornblower's Complaint alleges that it "advanced" funds to pay the wages and benefits of the Vessel's crew that HSF did not pay. Hornblower Compl. ¶¶ 6–8, ECF No. 28. In Hornblower's Cross–Motion, it states that it "paid the wages directly to the crew," Mem. in Supp. of Hornblower and HMS's Mot. for Summ. J. 5, ECF No. 69, and provides a declaration and invoices in support (the "Wage Invoices"). In its Motion, the United States argues for summary judgment in its favor on Hornblower's wage claim,[17] but in its Response to

any action or present any position in connection with this Mortgage inconsistent with, or in opposition to, the ... priority of the First Preferred Fleet Mortgage ... even if the First Mortgagee's efforts to obtain the value of its collateral would not yield any proceeds to the Mortgagee hereunder.
*Id.* at 14 (emphasis added).

15. That provision provides:
(5) "preferred maritime lien" means a maritime lien on a vessel—
(A) arising before a preferred mortgage was filed under section 31321 of this title;
(B) for damages arising out of maritime tort;
(C) for wages of a stevedore when employed directly by a person listed in section 31341 of this title;

(D) for wages of the crew of the vessel;
(E) for general average; or
(F) for salvage, including contract salvage;....
46 U.S.C. § 31301.

16. That provision provides that "the preferred mortgage lien ... has priority over all claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court, and *preferred maritime liens*)." 46 U.S.C. § 31326(b)(2) (emphasis added).

17. In its Motion, the United States argues that Hornblower does not have a preferred maritime lien for crew wages. The United States interpreted the word "advanced" in Hornblower's Complaint as indicating that Horn-

Hornblower's Cross–Motion, it retreats, requesting that the court withhold summary judgment on the issue in order to allow further discovery. The United States claims that Hornblower's Cross–Motion substantively rewords the wage claim, Hornblower did not provide the Wage Invoices prior to its Cross–Motion, and, thus, the United States has not had sufficient opportunity to discover information essential to opposing the wage claim.

■ To begin, the court finds no merit to the claim that Hornblower substantively reworded its wage claim. Hornblower's Complaint characterized the lien as a preferred maritime lien for wage advances. Contrary to the United States' pronouncements, Hornblower did not "allege[ ] that it 'advanced' money to the shipowner, [HSF]." United States' Response to Hornblower and HMS's Mot. for Summ. J. 5, ECF No. 72.[18] Rather, Hornblower alleged that it advanced money to cover wages that "HSF did not pay." Hornblower Compl. ¶¶ 6–7. Hornblower's Complaint provided notice of the same wage claim found in its Cross–Motion; there is no substantive rewording, nor is the wording indefinite. For reasons unknown, the United States misinterpreted the Complaint.[19] This error does not enti-

tle it to deferral of summary judgment and additional discovery.

■ The United States might be eligible for deferral and additional discovery if it " 'has not had the opportunity to discover information that is essential to [its] opposition.' " *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "However, a party generally must comply with Federal Rule of Civil Procedure 56[d]." *Id.*[20] Under Rule 56(d), the court need only consider granting additional discovery if the United States "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," Fed.R.Civ.P. 56(d), and identifies which aspects of discovery require more time to complete. *See Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir.1995). The United States did not file either an affidavit or a declaration.

■ Failure to comply with Rule 56(d) is reason enough to deny additional discovery. *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir.2002) (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir.1996)). Nevertheless, the Fourth Circuit has recognized that a party need

blower merely loaned funds to HSF, which, in turn, potentially allowed HSF to pay the crew's wages. *See, e.g., United States' Response to Hornblower and HMS's Mot. for Summ. J.* 5, ECF No. 72. The United States argues that an advance is a general loan, which does not amount to payment of crew wages. *See In re Good Ship Appledore, Ltd.,* 122 B.R. 821, 829 (Bankr.D.Me.1990) (denying claim for subrogated preferred maritime lien for crew wages because "one cannot conclude that the advance was made *for the purpose* of paying crew wages" (emphasis in original)).

18. *See supra* note 17.

19. The United States concedes that if Hornblower paid the crew's wages, rather than merely loaned HSF money, "it may well have a subrogated seaman's wage lien under the criteria set forth in" relevant case law. United ed States' Response to Hornblower and HMS's Mot. for Summ. J. 5 (citations omitted). Interestingly, that relevant case law refers to direct payments to crew members as advances, yet the United States nonetheless interpreted Hornblower's use of that term in its Complaint as connoting a general loan to the shipowner. *See supra* note 17.

20. As of December 1, 2010, Rule 56(f) was recodified "without substantial change" as Rule 56(d). Fed.R.Civ.P. 56(d) cmt. 2010.

not meet the terms of Rule 56(d) in every case:

> [S]trict compliance with Rule 56[d] affidavits [or declarations] may not be necessary where the circumstances are such that "the nonmoving party, through no fault of its own, has had little or no opportunity to conduct discovery, and when fact-intensive issues, such as intent, are involved," provided that "the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary."

*Nader*, 549 F.3d at 961 (quoting *Harrods* 302 F.3d at 244). As to the notice prerequisite, the United States, in a response brief filed nearly a month after its own summary judgment motion on the issue, offers unsworn assertions that additional discovery could elucidate the wage claim. In other words, the United States told the court that discovery was complete and the issue was ripe, but now recants in a response that does not even reference Rule 56(d). The court finds that this approach does not "serve as the functional equivalent of an affidavit [or declaration]." *Harrods*, 302 F.3d at 245. The United States failed to adequately inform the court that the motion is pre-mature and that more discovery is necessary.

The court also finds that the circumstances in this case do not merit deviation from Rule 56(d)'s affidavit or declaration requirement. In determining whether such circumstances exist, the threshold issue is whether the United States had suffi-cient opportunity to conduct discovery on the wage claim. *See Nader*, 549 F.3d at 961. If it did not have sufficient opportunity, the issue is whether it was denied that opportunity through no fault of its own. *See id.* The United States does not assert that it had an insufficient opportunity to conduct discovery in general. Rather, it claims that it did not have sufficient opportunity to conduct discovery on the allegedly reworded wage claim in Hornblower's Cross–Motion. The court already found that Hornblower did not substantively reword its wage claim.[21] Accordingly, to the extent the United States had little or no opportunity to conduct discovery on the wage claim, it was denied that opportunity at its own fault in inexplicably misinterpreting Hornblower's Complaint.[22] The United States is not the victim of any haste on the part of Hornblower to prematurely conclude this matter.[23] The Motion and Hornblower's Cross–Motion are ripe. The court will not withhold decision.

▮▮▮ In determining whether Hornblower has a preferred maritime lien for crew wages, the threshold issue is whether the Vessel's crew was entitled to the protection of a preferred maritime lien. *See Gen. Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration,* 668 F.2d 811, 813–14 (5th Cir.1982) ("One who advances money to pay crew's wages is entitled to a maritime lien of the *same rank.*" (emphasis added) (citations omitted)). There is no dispute that, after May 1, 2009, a crew under the management of Hornblower pro-

---

21. *See supra* 17.

22. *See supra* note 19 and accompanying text. The United States also asserts that Hornblower did not produce the Wage Invoices prior to filing its Cross–Motion, but that fact, even if true, is immaterial because it does not demonstrate that the United States was ever hindered "through no fault of its own," *Nader,* 549 F.3d at 961, from discovering any "facts essential to justify its opposition." Fed. R.Civ.P. 56(d).

23. Indeed, the United States and the intervenor-plaintiffs jointly moved for the briefing schedule set by this court. *See* Joint Consent Mot. to Set Br'ing Schedule for Dispositive Mots. for Priority of Claims, ECF No. 52.

vided services to the Vessel. Although Hornblower, and not HSF, hired and managed the crew, the crew need not be employees of the shipowner to have a preferred maritime lien for wages. Rather, the crew need only provide services aboard the Vessel in order to be eligible. *See Int'l Paint Co., Inc. v. M/V Mission Viking*, 637 F.2d 382, 385 (5th Cir.1981); *see also Bominflot, Inc. v. The M/V Henrich S*, 465 F.3d 144, 147 (4th Cir.2006) (noting that American law takes a broader view of maritime liens than most nations).[24] Accordingly, the court finds that the crew serving the Vessel after May 1, 2009 was entitled to a preferred maritime lien for wages within the meaning of 46 U.S.C. § 31301(5)(D).

The final issue is whether Hornblower is subrogated to that lien. In order to prevail on summary judgment, Hornblower must demonstrate that there is no genuine issue that it advanced the money to pay the crew's wages. *See* Fed. R.Civ.P. 56(a); *Gen. Elec. Credit & Leasing Corp.*, 668 F.2d at 814. There is no dispute that Hornblower advanced $21,025.00 for the crew because HSF failed to perform its contractual obligation to pay the costs of the Vessel's crew.[25] Hornblower states that there is no genuine issue that it advanced the money by paying the wages directly to the crew, citing to the declaration of John Waggoner, President and Chief Executive Officer of both Hornblower and HMS, and to the Wage Invoices.[26] The Wage Invoices are itemized bills from Hornblower to HSF, which specify the amounts owed Hornblower for the "salary" of certain individuals. Hornblower Wage Invoices, John Waggoner Decl., Ex. E., ECF No. 69–1. Waggoner's declaration provides that those Wage Invoices reflect that Hornblower billed HSF for crew wages.[27] The court is satisfied that Hornblower met its burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on its wage claim. *See* Fed. R.Civ.P. 56(c)(1)(A). Unless the United States demonstrates that there is a genuine issue as to whether Hornblower discharged the crew's preferred maritime lien by paying their wages, the court must find for Hornblower. *See* Fed.R.Civ.P. 56(a); *see also Pollard v. United States*, 166 Fed. Appx. 674, 678 (4th Cir.2006); *In re McNallen*, 62 F.3d 619, 623–24 (4th Cir. 1995).

The United States does not controvert that Hornblower paid the $21,025.00 to the crew. *See* E.D. Va. Loc. Civ. R. 56(B). It

---

**24.** As stated by the Fourth Circuit, " '[i]f the law undertook to weigh with nice discrimination the exact amount and character of service with which each person employed aboard a vessel should render in order to entitle him to this lien, it would become a snare rather than a protection.' " *Jeffrey v. Henderson Bros.*, 193 F.2d 589, 592 (4th Cir. 1951) (quoting *Saylor v. Taylor*, 77 F. 476, 478 (4th Cir.1896)).

**25.** In its Motion, the United States claimed that Hornblower's Complaint framed the advance as a general loan to HSF rather than a payment to the crew. As discussed, this interpretation is erroneous. *See supra* notes 18–19 and accompanying text. It is also not supported by any evidence in the record.

**26.** The Wage Invoices cover services rendered for both the Vessel and the HUAKAI, but, as indicated in Waggoner's Declaration, "[t]he crew was assigned to both vessels and spent an equivalent amount of time on each vessel." John Waggoner Decl. ¶ 8.

**27.** Under Federal Rule of Civil Procedure 56(c)(4), a declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4). The Waggoner declaration satisfies these requirements.

merely requests deferral of summary judgment and additional discovery, which the court declines to grant.[28] Even searching the record, see Fed.R.Civ.P. 56(c)(3), the court finds that the United States did not demonstrate a genuine issue. Both in its Motion and its Response to Hornblower's Cross–Motion, it does not offer any evidence or point to any part of the record that supports finding against Hornblower on the wage claim. It merely claims that Hornblower reworded its wage claim and the Wage Invoices do not indicate which party paid the crew's wages. Both are untrue. The court already found that Hornblower did not reword the wage claim.[29] As to the Wage Invoices, a party may demonstrate a genuine issue by "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed.R.Civ.P. 56(c)(1)(B). However, the United States does not show that Waggoner's declaration and the Wage Invoices fail in that regard. It simply offers a bald, and unconvincing, assertion that "nothing attached to Hornblower's motion indicates which party [actually paid $21,025.00 to the crew]." United States' Response to Hornblower and HMS's Mot. for Summ. J. 6. The United States cannot withstand summary judgment with "conclusory allegations or unsubstantiated denials." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996). Like any party opposing summary judgment, it must "identify specific facts deriving from the pleadings ... admissions and affidavits to demonstrate either the existence or absence of an issue of

fact." Id.; see Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190–91 (4th Cir.1997).

The Wage Invoices and Waggoner declaration prove that Hornblower paid the crew's wages. Absent any showing to the contrary, the court is satisfied that there is no genuine dispute. The court **FINDS** that Hornblower possesses a preferred maritime lien in the amount of $21,025.00 for crew wages, which has priority over the First Mortgage to payment from the proceeds of the Vessel's sale.

### 2. CURE

■■■ HMS alleges that it is entitled to priority payment of $2,709.89 out of the proceeds because it "paid for the medical expenses of injured crew member Leonora Sison under the federal maritime law doctrine of cure." Mem. in Supp. of Hornblower and HMS's Mot. for Summ. J. 3. In support, HMS cites to Waggoner's declaration and invoices that itemize, among other charges, medical payments in the name of Leonora Sison. See Hornblower Medical Invoices, John Waggoner Decl., Ex. C, ECF No. 69–1. The United States does not controvert that HMS made such payments, let alone address the cure claim in any of its briefs. The court is satisfied that Hornblower proved there is no genuine issue that HMS paid those itemized expenses. The question then is whether that fact is material. In other words, the issue is whether those expenses constitute cure [30] and, if so, whether HMS possesses a preferred maritime lien for the amount it paid.

---

**28.** See supra 20.

**29.** See supra 17.

**30.** HMS's Cross–Motion as well as the Waggoner declaration assert that HMS paid the expenses under the doctrine of cure. Whether a payment of medical expenses occurred is

a question of fact, but whether those expenses constitute cure is a question of law. See Barlow v. Pan Atl. S.S. Corp., 101 F.2d 697, 698 (2d Cir.1939); see also Torres v. Caribbean Fishing Co. Inc., 30 Fed.Appx. 752, 753 (9th Cir.2002). As such, HMS and Waggoner's characterization is immaterial.

The doctrine of cure holds that "the vessel and her owners must provide medical care for a seaman who becomes sick or is wounded in the service of the ship." *In re Marine Asbestos Cases*, 265 F.3d 861, 868 (9th Cir.2001) (citing *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528, 58 S.Ct. 651, 82 L.Ed. 993 (1938)); *see also Moran Towing & Transp., Co. v. Lombas*, 58 F.3d 24, 27 (2d Cir.1995) (noting that cure "ensure[s] that the seaman does not incur expense in receiving medical treatment"). The shipowner's duty to provide cure creates a maritime lien in favor of the crew member. *See, e.g., Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1551 (11th Cir.1990); *Cargill, Inc., Skibsassurance-forening v. M/T Pacific Dawn*, 876 F.Supp. 508, 511 n. 2 (S.D.N.Y.1995). An injured crew member may bring an *in rem* action to enforce such a lien against the Vessel "even when the ship or the shipowner is not the injured seaman's employer." William Tetley, Maritime Liens and Claims 308 (2d ed. 1998). The court can assume without deciding that Leonora Sison had a maritime lien for cure and that HMS is subrogated to Sison's rights under it, *see* Benedict on Admiralty § 34 (7th ed. 2010), because even if true, that lien is lower in priority than the First Mortgage and, therefore, no proceeds are available to pay it.

HMS asserts that "[c]laims for maintenance and cure have the same high priority as wages." Mem. in Supp. of Hornblower and HMS's Mot. for Summ. J. 5 (citations omitted). In view of that assertion and the principle that crew wages have priority over preferred mortgages,[31] HMS believes that its cure claim necessarily has higher priority than the First Mortgage. HMS misapprehends the relevant law. First, under general maritime law, claims for maintenance and cure only have the same high priority *among maritime liens* as wages. *See, e.g., Thorsteinsson*, 891 F.2d at 1551 (11th Cir.1990); *Fredelos v. Merritt–Chapman & Scott Corp.*, 447 F.2d 435, 439–40 (5th Cir.1971) (per curiam). Neither the authority cited by HMS nor any binding authority supports finding that maintenance and cure have the same high priority relative to preferred mortgages as wages. *See* Schoenbaum § 9–6, 546–48 ("When a preferred ship mortgage is involved, additional priority rules come into play."); *see also United States v. One (1) 254 Ft. Freighter, M/V Andoria*, 570 F.Supp. 413, 415 (E.D.La. 1983) (ranking the priority of the various classes of claims), *aff'd*, 768 F.2d 597 (5th Cir.1985).

Second, under statutory law, maintenance and cure generally do not have the same high priority over preferred mortgages as wages. Crew wages constitute preferred maritime liens per se, 46 U.S.C. § 31301(5)(D),[32] and, therefore, always have priority over preferred mortgages. *Id.* § 31326(b)(1),[33] *See, e.g., The Eastern Temple*, 94 F.2d 374, 376 (4th Cir.1938). Maintenance and cure, on the other hand, are not always preferred maritime liens. *Cf. Fanos v. Maersk Line, Ltd.*, 246 F.Supp.2d 676, 681–82 (S.D.Tex. 2003). They are only preferred when the lien "aris[es] before a preferred mortgage was filed." 46 U.S.C. § 31301(5)(A). Since HMS paid Leonora Sison's medical expenses nearly two years after the United States recorded the First Mortgage, it necessarily could not have a preferred maritime lien for cure. Accordingly, to the extent that HMS possesses a maritime lien for cure, the court **FINDS** that lien

---

**31.** *Supra* Part IV.B.1.

**32.** *See supra* note 15.

**33.** *See supra* note 16 and accompanying text.

does not have higher priority than the First Mortgage to proceeds of the Vessel's sale.

### 3. NECESSARIES

Hornblower and HMS allege that they each possess a preferred maritime lien for the amount of necessaries each provided to the Vessel at the direction HSF. There are two categories of services underlying these purported preferred maritime liens: (1) services HMS provided prior to the Vessel's May 30, 2007 completion date to obtain the necessary permits and documentation for the Vessel; and (2) services Hornblower and HMS performed after construction was complete. There is no dispute as to any material fact. The only dispute concerns whether those services created preferred maritime liens. Accordingly, the necessaries claims are a proper subject for summary judgment.

A maritime lien for necessaries can only attach to a vessel for services rendered to that vessel. *See* 46 U.S.C. § 31342; *Hawkspere Shipping Co., Ltd. v. Intamex, S.A.,* 330 F.3d 225, 230 n. 3 (4th Cir.2003). If services are performed before the manufacturer finishes building the vessel, then those services necessarily were not rendered to the vessel, and, therefore, do not give rise to a maritime lien.[34] *See Chase Manhattan Fin. Serv., Inc. v. McMillian,* 896 F.2d 452, 456–57 (10th Cir.1990); *cf. Tucker v. Alexandroff,* 183 U.S. 424, 438, 22 S.Ct. 195, 46 L.Ed. 264 (1902) ("Prior to [a vessel's] launching she is a mere congeries of wood and iron—

an ordinary piece of personal property-as distinctly a land structure as a house, and subject only to mechanics' liens created by state law and enforceable in the state courts."). Put another way, a maritime lien for necessaries can only attach to a vessel for services performed subsequent to the vessel's completion and launch. *See N. Pac. S.S. v. Hall Bros. Ry.,* 249 U.S. 119, 127, 39 S.Ct. 221, 63 L.Ed. 510 (1919) ("[T]he structure does not become a ship, in the legal sense, until it is completed and launched."); *cf. Hyundai Heavy Indus. Co., Ltd. v. M/V Saibos FDS,* 163 F.Supp.2d 1307, 1310–11 (N.D.Ala.2001). HMS does not possess a maritime lien for the first category of services because they were provided prior to the Vessel's completion. Since HMS does not have maritime lien for that first category, it necessarily does not have a preferred maritime lien for them. *See* 46 U.S.C. § 31301(5).

Hornblower and HMS performed the second category of services after the Vessel was completed and launched, and, thus, may possess maritime liens for necessaries. Assuming they do, the question then is whether those liens have priority over the First Mortgage. Maritime liens for necessaries only attain preferred status if they arose before a preferred mortgage was filed. *See* 46 U.S.C. §§ 31301(5)(A), 31342. Here, no maritime lien could have arisen before a preferred mortgage was filed because the First and Second Mortgages were filed at the exact same moment that construction of the Vessel was deemed complete. Ac-

---

**34.** Services such as obtaining necessary permits for a yet-to-be completed vessel may be for the vessel's eventual benefit. Nevertheless, they cannot create maritime liens because a maritime lien "is a right based upon the legal fiction that the ship is the wrongdoer-the ship itself caused the loss and can be called to the bar to make good the loss." Schoenbaum § 9–1, 515; *see also Piedmont &*

*George's Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 3, 41 S.Ct. 1, 65 L.Ed. 97 (1920). Courts cannot ignore this legal fiction; like a person, a vessel cannot be a wrongdoer until it exists. The completion benchmark, although rigid, is a necessary corollary of the maritime lien's "theoretical basis." Schoenbaum § 9–1, 515.

cordingly, to the extent Hornblower and HMS even have maritime liens for the second category of services, those liens are subordinate to the First Mortgage.

 Hornblower and HMS seek to circumvent this temporal barrier by arguing that their maritime liens for necessaries relate back to the date of formation of the Management Agreement, under which the services giving rise to those liens were performed. They allege that "relevant case law explains that when a contract which obligates a provider of necessaries to provide services both before and after the filing date of the mortgage, that provider has a preferred maritime lien on the services provided." Mem. in Supp. of Hornblower and HMS's Mot. for Summ. J. 8. A necessaries lien can prime an earlier-filed mortgage if the obligation underlying that lien was performed pursuant to a contract that also calls for performance before the filing of the mortgage. *See Redwood Empire Prod. Credit Ass'n v. Fishing Vessel Owners Marine Ways, Inc.,* 530 F.Supp. 75, 76–77 (W.D.Wash. 1981); *cf. Bank One, Louisiana N.A. v. MR. DEAN MV,* 293 F.3d 830, 837 (5th Cir.2002). In order to do so, however, there must actually be performance before the mortgage is filed,[35] *see Redwood Empire,* 530 F.Supp. at 76, and the preceding performance must itself give rise to a preferred maritime lien. *See* Schoenbaum § 9–6, 548.

Hornblower and HMS provided the first category of services pursuant to the Management Agreement and before the filing of any preferred mortgages. However, the court found that those services did not give rise to a preferred maritime lien since the Vessel was not yet complete when the services were performed. Accordingly,

Hornblower and HMS's relation-back argument fails. To the extent that Hornblower and HMS possess maritime liens for necessaries, the court **FINDS** that those liens do not have higher priority than the First Mortgage to proceeds of the Vessel's sale.

## V. CONCLUSION

For the reasons stated above, the Motion is **GRANTED** as to the First Mortgage's priority over the Second Mortgage, HMS's claim for cure, and Hornblower and HMS's claims for necessaries. The Motion is **DENIED** as to the First Mortgage's priority over Hornblower's maritime lien for wages. Austal's Cross–Motion is **DENIED.** Hornblower and HMS's Cross–Motion is **GRANTED** as to Hornblower's maritime lien for wages and **DENIED** as to HMS's claim for cure and Hornblower and HMS's claims for necessaries.

Hornblower's preferred maritime lien for wages is entitled to first-priority payment out of the proceeds of the Vessel's sale. Accordingly, the United States is **ORDERED** to pay Hornblower Twenty–One Thousand and Twenty–Five Dollars ($21,025.00) in cash or its equivalent, leaving $24,627,185.21 remaining in the proceeds fund maintained by MARAD. The United States' First Mortgage is entitled to second-priority payment out of the proceeds of the Vessel's sale. Those proceeds are insufficient to satisfy the outstanding balance on the First Mortgage. Accordingly, the court **ORDERS** that the remaining proceeds in the fund maintained by MARAD be distributed to MARAD in partial satisfaction of the United States' First Mortgage. Having disbursed all of the proceeds of the Vessel's sale, it is further

---

**35.** It is not enough that services provided subsequent to the filing of a mortgage were performed pursuant to a contract that predat-

ed that mortgage. *Cf. Hyundai Heavy Indus.,* 163 F.Supp.2d at 1314.

ORDERED that all *in rem* claims against the Vessel and the proceeds of the Vessel's sale are **DISMISSED** with prejudice.

The Clerk is **DIRECTED** to enter judgment in accordance with this Opinion and Final Order. The Clerk is further **DIRECTED** to forward a copy of this Opinion and Final Order to all parties and/or counsel of record.

**IT IS SO ORDERED.**